692 S.E.2d 490

The STATE, Respondent,

v.

H. Dewain HERRING, Appellant.

No. 26750.

Supreme Court of South Carolina.

Heard June 23, 2009.

Decided Dec. 21, 2009.

Rehearing Denied May 14, 2010.

Graham L. Newman and Richard A. Harpootlian, both of Columbia, and Katherine Carruth Goode, of Winnsboro, for Appellant.

Attorney General Henry Dargan McMaster, Chief Deputy Attorney General John W. McIntosh, Assistant Deputy Attorney General Donald J. Zelenka, Assistant Attorney General S. Creighton Waters, and Solicitor Warren Blair Giese, all of Columbia, for Respondent.

Justice WALLER.

Appellant, H. Dewain Herring, was convicted of murder and pointing and presenting a firearm. We affirm.[1]

## FACTS

Herring was charged with the January 29, 2006 shooting of an employee of Chastity's Gold Nightclub (Chastity's), a strip club in Columbia. The facts giving rise to the shooting are as follows.

After golfing in Aiken with friends on the day of January 28, 2006, at which he had consumed numerous beers, Herring stopped by a bar for a few drinks on the way home, and then returned home around 7:30 p.m. Herring had a couple more drinks at his home with a golfing buddy before the friend left. Herring laid down intending to go to sleep, but got up and decided to go a Forest Acres restaurant. When the restaurant was closed, Herring changed his mind and went to Platinum Plus, a Columbia strip club. He had a drink and paid a dancer for a lap dance and left Platinum Plus. On his way home, he decided to stop by Chastity's on River Drive; he arrived shortly after 11:00 p.m. According to Herring, he ordered a drink at the bar, but he has very little recall of any events for several hours thereafter.

---

1. The appeal was certified to this Court from the Court of Appeals on motion of counsel for Herring.

According to witnesses and employees of Chastity's, Herring purchased a drink and paid for a $30.00, three minute lap dance from a dancer named Mia. After the lap dance, Herring paid Mia for a $300 dance in what was known as the Champagne room.

Mia took Herring to the Champagne room and told him to wait while she went to freshen up. A bouncer, Carl Weeks, went to check on Herring a few minutes later and found him naked and masturbating on the sofa. The bouncer told Herring he could not do that and told him he would have to leave. When Herring did not move, the bouncer got the manager, John Johnson (John John). When they returned, Herring was dressed. Weeks told Herring he would either have to leave, or they would call police and have him arrested for solicitation of prostitution. According to Weeks, Herring responded, "No. I will fucking shoot you." John John and a bouncer named Donnie Hawkins escorted Herring to the front door at 11:57 p.m. John John walked outside with Herring and used a two-way radio to call Herring's license plate number out to Weeks, who was standing in the doorway, as Herring drove away. Weeks and Hawkins watched as Herring backed up his black SUV, and fumbled with his glove compartment with his right hand. Herring slowly pulled away, putting down the passenger side windows as he went. Hawkins, Weeks and John John had just gone inside when they saw Herring's vehicle coming back down River Drive toward Chastity's. According to Hawkins, John John was right inside the door. Hawkins saw a flash of light come from the side of the vehicle, and heard John John say, "Oh shit!" John John fell to the floor, having been hit in the left ear by a bullet which came through the front door. He died a short while later at the hospital.

Upon arriving at the scene of Chastity's, police were given Herring's license tag number, which was registered to his office address in Columbia. Police patrolled the office parking lot, but did not find the vehicle. They then determined Herring's home address and went there at 2:10 a.m. on January 29, 2006. A police officer, seeing a light on in the garage, peeked in the garage window to see if the suspect was there. Although the suspect was not there, the officer did see the vehicle, which they realized was Herring's. They knocked on the door and rang the doorbell several times and, receiving

no answer, they returned to the police station and obtained a search warrant for the home.[2]

Police went back to Herring's residence at approximately 4:00 a.m. to execute the search warrant. They rang the doorbell several times but received no answer. They entered forcibly, announcing they were police with a search warrant. Officer Linfert testified that he saw Herring in the hallway and recognized him from the photo on his driver's license. Linfert told Herring to get down on the ground, but Herring ran back down the hall toward a bedroom. He followed Herring to the bedroom, and saw Herring pull a gun from a nightstand and point it in his direction. Officer Linfert yelled at him to drop the gun and then fired one shot at him. Other officers also opened fire, and Herring was hit in the arm. Herring called 9-1-1 and told them he believed there were intruders in his home. After talking with the 9-1-1 operator, Herring surrendered upon realizing the "intruders" were indeed police officers.

Herring initially told police he had not left the house after returning home from Aiken; he did not recall going to Chastity's. When police told him of the video tape which showed him entering and leaving Chastity's, he remembered only being at the bar, having a drink, and a gunshot firing; the next memory he had was of police bursting into his home. He subsequently began remembering more details, such as paying for a lap dance from a light skinned black woman.

Bullet fragments removed from John John's head conclusively matched a .357 Magnum Ruger owned by Herring; the Ruger was found under some clothing in his bedroom closet during a SLED search of the home.[3] Gunshot residue was found on the passenger side of Herring's vehicle. A jury convicted Herring of murder and pointing and presenting a firearm.

---

**2.** Several officers remained outside the premises while the warrant was obtained.

**3.** SLED searched the residence relative to the shooting which occurred between police and Herring at the time of Herring's arrest.

## ISSUES

1. Did the trial court err in denying Herring's motions to suppress evidence found during the search of his residence?

2. Did the trial court err in allowing lay witnesses to testify as to their opinion of what could be seen on a videotape which recorded Herring as he exited Chastity's?

## 1. SEARCH WARRANTS/SUPPRESSION OF EVIDENCE

Herring contends the trial court erred in denying his motion to suppress evidence seized by police during the searches of his home and automobile. We disagree.

### a. Initial Search

Herring contends the initial peek by police into his garage (when his black SUV was seen), was an illegal search, which thereby led to the issuance of a search warrant. Accordingly, Herring asserts the subsequent search of his home was the impermissible fruit of the illegal garage search, and that police otherwise had no basis upon which to search the residence. Herring also contends the subsequent SLED search of his home was illegal inasmuch as it a) resulted from the two prior illegal searches, and b) the SLED warrant was invalid as it was not issued in compliance with S.C.Code Ann. § 17–13–140. For numerous reasons, we find the evidence seized by police was properly admitted.

Regarding the initial search, Herring contends that when police crossed the curtilage of his yard and peered into his garage windows, it constituted an illegal search. The trial court agreed with Herring and held Officer Linfert's peek into Herring's garage violated Herring's expectation of privacy. However, the trial court found that since no evidence was seized as a result of that search, there was nothing to suppress; it therefore went on to address the validity of the other searches, which it found permissible.

Initially, as discussed below, we disagree with the trial court's conclusion that Officer Linfert's initial peek into the garage window constituted an illegal search. Regardless,

however, we find the peek into the window did not lead to discovery of any further evidence, such that it was not "fruit of the poisonous tree" and therefore did not taint the subsequent searches.

As noted previously, prior to going to Herring's residence, police responded to a shooting at Chastity's nightclub at which the manager of the club was shot and killed. While at Chastity's, police were given a description of Herring's black SUV, as well as the corresponding South Carolina license plate number which was written down by witnesses. Police watched the video which showed the suspect as he entered and departed from the nightclub, and police were given a color photograph of the suspect from the video.

Police obtained Herring's identifying information from the license tag number. When they went to the registered address for the vehicle, a business office, there was no black SUV in the parking lot. Officer Linfert checked the Department of Motor Vehicle website for other addresses listed for Herring, which revealed his home address. Based upon this information, police went to the address at approximately 2:00 a.m. Officer, seeing a light on in the garage, peeked in the garage window to see if the suspect was there. Although the suspect was not there, Linfert saw the black SUV, and recognized it as the suspect's vehicle. Police knocked on the door and rang the doorbell several times; receiving no answer, they returned to the police station and obtained a search warrant for the home.

Private residences are places in which an individual normally expects privacy free of governmental intrusion not authorized by a warrant, and that expectation is one society recognizes as justifiable. Accordingly, searches and seizures inside a home without a warrant are presumptively unreasonable absent exigent circumstances. *United States v. Karo,* 468 U.S. 705, 104 S.Ct. 3296, 82 L.Ed.2d 530 (1984). The Fourth Amendment extends that same protection to outbuildings in the curtilage of the home. *United States v. Dunn,* 480 U.S. 294, 107 S.Ct. 1134, 94 L.Ed.2d 326 (1987); *Rogers v. Pendleton,* 249 F.3d 279, 287 (4th Cir.2001).[4]

---

4. It is equally well settled that searches and seizures of property in plain view are presumptively reasonable. What a person knowingly

 However, because the ultimate touchstone of the Fourth Amendment is "reasonableness," the warrant requirement is subject to certain exceptions. *Katz v. United States,* 389 U.S. 347, 357, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). The United States Supreme Court has recognized that one exigency obviating the requirement for a warrant is the need to protect or preserve life or avoid serious injury. *Brigham City, Utah v. Stuart,* 547 U.S. 398, 126 S.Ct. 1943, 164 L.Ed.2d 650 (2006). An action is "reasonable" under the Fourth Amendment, regardless of the individual officer's state of mind, "as long as the circumstances, viewed objectively, justify [the] action." *Scott v. United States,* 436 U.S. 128, 138, 98 S.Ct. 1717, 56 L.Ed.2d 168 (1978). A fairly perceived need to act on the spot may justify entry and search under the exigent circumstances exception to the warrant requirement. *Schmerber v. California,* 384 U.S. 757, 770–771, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966). The likelihood a suspect will imminently flee is also an exigency warranting such an intrusion. *Johnson v. United States,* 333 U.S. 10, 15, 68 S.Ct. 367, 92 L.Ed. 436 (1948). Protecting the safety of police officers has also been held an exigent circumstance. *Chimel v. California,* 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969). A warrantless search is justified under the exigent circumstances doctrine to prevent a suspect from fleeing or where there is a risk of danger to police or others inside or outside a dwelling. *Minnesota v. Olson,* 495 U.S. 91, 100, 110 S.Ct. 1684, 109 L.Ed.2d 85 (1990). In such circumstances, a protective sweep of the premises may be permitted. *See Maryland v. Buie,* 494 U.S. 325, 337, 110 S.Ct. 1093, 108 L.Ed.2d 276 (1990); *cf. State v. Abdullah,* 357 S.C. 344, 592 S.E.2d 344 (Ct.App.2004).

 Under the circumstances presented, we find the exigencies of the situation justified Officer Linfert's look into Herring's garage at 2:00 a.m. It is undisputed that police had knowledge of Herring's identity, his residence, the make and model of his vehicle, and his license tag number. Officer Linfert testified that upon arriving at the home, he saw a light on in the garage and therefore looked through the window to

---

exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection. *California v. Ciraolo,* 476 U.S. 207, 213, 106 S.Ct. 1809, 90 L.Ed.2d 210 (1986) (quoting *Katz v. United States,* 389 U.S. 347, 351, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967)).

see if the suspect was inside. Police officers were looking for a suspected murderer whom they knew was likely to be armed with a deadly weapon.

We find it was objectively reasonable for Officer Linfert to take precautions to protect his own safety, and the safety of the officers around him, by looking into the garage to see if the suspect was there. When nobody was in the garage, police followed proper procedure by knocking on the door and ringing the doorbell. Receiving no answer, they stationed men at the house and went to obtain a warrant. Given the exigent circumstances then and there presenting, we find Officer Linfert's minimal intrusion was objectively reasonable and did not constitute a Fourth Amendment violation. *Cf. Chimel v. California.*

Moreover, Officer Linfert's peek into the garage yielded no evidence against Herring. Police already had knowledge of the make, model and license plate number of the vehicle the suspect drove; they knew the automobile was registered to Herring, and they knew his residential address was 406 Alexander Circle. Officer Linfert's observation of the vehicle in the garage yielded no evidence which further inculpated Herring. We find the trial court erred in holding this initial "search" violated Herring's Fourth Amendment rights; the *de minimis* intrusion to secure the officers' safety did not necessitate suppression.

### b. Search of residence

Herring next asserts the subsequently issued warrant was defective such that the search conducted by the Richland County Sheriff's Department (RCSD) was illegal. He contends the affidavit supporting the warrant failed to connect his residence to the crime at Chastity's; he also contends the information in the affidavit was false because the officer who prepared the affidavit did not actually appear before the magistrate but, instead, sent another officer. We find the warrant was supported by probable cause and was properly issued.

The affidavit states that deputies responded to Chastity's to find the Victim, John Johnson, who had been shot in the head and who subsequently died upon arrival at the hospital. Wit-

nesses at Chastity's described the suspect, the clothing he was wearing, the car he was driving as a black Toyota Forerunner, and gave the license tag number of SC 1891. Department of Motor Vehicle records indicated the car was registered to Dewain Herring, of 1361 Landmark Drive, which was a closed business. A search of Richland County records provided an additional address for Herring at 460 Alexander Circle. Based upon this information, the affidavit lists the property sought as "firearms, ammunition, burgundy sweater, white turtleneck shirt, khaki pants, eyeglasses, black 1996 Toyota Forerunner, SC/EU1891, and any and all other evidence associated to a shooting incident."

■■■■ A search warrant may issue only upon a finding of probable cause. *State v. Baccus,* 367 S.C. 41, 625 S.E.2d 216 (2006), *cert. denied* —— U.S. ——, 129 S.Ct. 733, 172 L.Ed.2d 735 (2008). The duty of the reviewing court is to ensure the issuing magistrate had a substantial basis upon which to conclude that probable cause existed. *Id.; State v. Adams,* 291 S.C. 132, 352 S.E.2d 483 (1987). A "totality-of-the-circumstances" test is utilized in probable cause determinations:

The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place.

*Illinois v. Gates,* 462 U.S. 213, 238, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983).

We find the affidavit sufficient to establish probable cause for police to look for Herring, a murder weapon, and the Toyota Forerunner at his known residence.

■■■ Herring asserts the RCSD warrant was defective because, notwithstanding the affidavit contained the name of Officer Linfert at the top, it was actually Officer Davis who appeared before the Magistrate. However, Officer Linfert clarified that the reason his name was listed is that Officer Davis did not have a search warrant form on his computer, and the form was typed by Linfert on his computer and his name was automatically inserted at the top; Linfert simply

forgot to change the name to Davis. Officer Davis personally appeared before the magistrate and swore to the information; he was familiar with the information and background of the case, having been to Chastity's and having interviewed the witnesses. We find the fact that Linfert's name was at the top of the affidavit did not vitiate the validity of the warrant. *State v. Shupper*, 263 S.C. 53, 207 S.E.2d 799 (1974) (typographical error did not affect validity of search warrant). Accordingly, we find the evidence seized during the RCSD's search of the residence was properly admitted by the trial court.

### c. SLED Search

 Finally, Herring challenges the search performed by SLED. He contends the SLED warrant, which was obtained by facsimile, was invalid; he also asserts the methodology employed, which was authorized by an order of the Chief Justice,[5] violates the search warrant statute, S.C.Code Ann. § 17–13–140. We find the trial court properly upheld SLED's search of the residence.

SLED was called in to investigate after the sheriff's deputies wounded Herring during their attempt to arrest him at the home. SLED obtained a warrant utilizing the telephone procedure set forth in the Chief Justice's order of July 2001. Agent Lawrence testified that he had prepared the search warrant, and faxed it to Magistrate McDuffie, who was in bond court. The Magistrate swore him over the phone. Although SLED was not directly investigating the murder, they were investigating the shooting by police officers, and were looking for firearms, cartridges, blood, projectiles, blood, and any evidence relating to a shooting incident at that address. As a result of the search, they found the khaki pants, white turtle neck, burgundy sweater Herring was wearing at the time of the shooting, and two weapons, a Smith and

---

5. *See http://www.sccourts.org/courtOrders/displayOrder.cfm?orderNo= 2001-07-26-01*. The order was issued pursuant to Art. V, § 4 of the S.C. CONST. (Chief Justice of the Supreme Court shall·be the administrative head of the unified judicial system). The order allows for issuance of search warrants by facsimile under controlled conditions, and sets forth the requirements therefore.

Wesson .357 revolver and a Ruger .357 pistol. The Ruger was in the bedroom closet under some clothes.

S.C.Code Ann. § 17–13–140 states, in pertinent part:

A warrant issued hereunder shall be issued only upon affidavit **sworn to before the magistrate,** municipal judicial officer, or judge of a court of record establishing the grounds for the warrant. If the magistrate, municipal judge, or other judicial officer abovementioned is satisfied that the grounds for the application exist or that there is probable cause to believe that they exist, he shall issue a warrant identifying the property and naming or describing the person or place to be searched.

(Emphasis supplied). Herring asserts the statute requires the affiant appear before the magistrate **in person.** We disagree.

Contrary to Herring's contention, the language does not state an affidavit must be sworn in person. It only requires the affidavit be sworn. Officer Lawrence, who prepared the affidavit, was sworn over the telephone by the Magistrate. We find this complies with the literal terms of the statute such that there was no defect in the warrant. *Cf. Gay v. Ariail,* 381 S.C. 341, 673 S.E.2d 418 (2009) (literal terms of statute prevail); *Collins v. Doe,* 352 S.C. 462, 574 S.E.2d 739 (2002) (where terms of a statute are clear, there is no room for construction).

Herring cites *State v. McKnight,* 291 S.C. 110, 352 S.E.2d 471 (1987) as supporting his contention that issuance of a warrant via facsimile was invalid. In *McKnight,* police officers appeared before a magistrate to obtain a warrant, but did not complete an affidavit in support thereof. Notwithstanding the officers were sworn and gave oral testimony to the magistrate, we held a "search warrant affidavit which itself is insufficient to establish probable cause may be supplemented before the magistrate by sworn oral testimony.... However, sworn oral testimony, standing alone, does not satisfy the statute." 291 S.C. at 113, 352 S.E.2d at 473 (internal citations omitted). In *McKnight,* we found the mandatory requirement of an affidavit lacking, thereby requiring suppression. The Court noted § 17–13–140 imposes stricter requirements than does the Fourth Amendment, and that "[a] search warrant

that would survive constitutional scrutiny may still be defective under the statute." *Id.*

Recently, however, we recognized that there is a " 'good faith' exception to the statute's [S.C.Code Ann. 17–13–140] requirements where the officers make a good faith attempt to comply with the statute's affidavit procedures." *State v. Covert*, 382 S.C. 205, 675 S.E.2d 740 (2009), *citing McKnight.*[6]

We find the present circumstances give rise to such a good faith exception. It was 4:00 in the morning, and SLED agents were attempting to obtain a warrant to investigate a shooting by Richland County Sheriff's deputies of a prominent Columbia attorney. We hold the officers made a good faith attempt to comply with the affidavit procedures, and accordingly, we affirm the trial court's ruling.

■ Moreover, even if we were to hold the SLED search illegal, we would hold any error was harmless. A videotape from Chastity's shows Herring entering and leaving the club. Several witnesses identified Herring from the videotape, and his vehicle and license tag number were identified. Two witnesses saw him drive away from the club, and then testified they saw his vehicle returning down River Drive. Donald Hawkins saw Herring's car come back into the parking lot, saw a flash come from the side of the vehicle, heard John John say "oh shit," and then saw that John John had been hit by a bullet. Further, although Herring denied intentionally shooting anyone, he admitted he owns several guns, including a .357 Ruger, which he usually carries with him in his Toyota Forerunner, and he admitted he had some memory of a gun going off. Finally, gunshot residue was found on the passenger side of the vehicle, which was ultimately connected to Herring's Ruger. Accordingly, admission of the evidence seized in the

---

6. In *Covert*, we left open the question of whether a good faith exception applies when "the officers reasonably believe the warrant is valid when the search is made, but is subsequently determined to be invalid." *Id.* at 209, 675 S.E.2d at 743. Given our recognition of an exception for officers' good faith attempt to comply with the affidavit requirement, we find no reason not to extend such a good faith exception to a warrant reasonably believed to be valid, but later determined invalid. Accordingly, even if we were to determine the affidavit was improper, we would find the SLED agents acted in good faith and reasonably believed the warrant valid, such that the search should be upheld.

SLED search, even if erroneous, was harmless. *State v. Gillian*, 373 S.C. 601, 646 S.E.2d 872 (2007); *State v. Garner*, 304 S.C. 220, 222, 403 S.E.2d 631, 632 (1991) (holding improperly admitted evidence harmless error given overwhelming evidence of guilt). We affirm the trial court's ruling concerning the SLED search.

## 2. LAY OPINIONS REGARDING VIDEOTAPE

██ Herring next contends the trial court should not have allowed lay witnesses to testify as to what they could see on the videotape of Herring exiting Chastity's, because they did not personally observe the events in question but only viewed them on a tape; he also asserts reversible error in the denial of his motion for a mistrial.

██ The admission or exclusion of testimonial evidence falls within the sound discretion of the trial court, whose decision will not be disturbed on appeal absent abuse resulting in prejudice. *State v. Holder*, 382 S.C. 278, 676 S.E.2d 690 (2009). Similarly, whether to grant or deny a mistrial is within the discretion of the trial court and will not be reversed on appeal absent an abuse of discretion. *State v. Sweet*, 374 S.C. 1, 647 S.E.2d 202 (2007). The grant of a motion for a mistrial is an extreme measure which should be taken only where an incident is so grievous that the prejudicial effect can be removed in no other way. *State v. Beckham*, 334 S.C. 302, 513 S.E.2d 606 (1999). Generally, a curative instruction to disregard the testimony is deemed to have cured any alleged error. *State v. Edwards*, 373 S.C. 230, 236, 644 S.E.2d 66, 69 (Ct.App.2007), *aff'd as modified* 383 S.C. 66, 678 S.E.2d 405 (2009); *State v. Dawkins*, 297 S.C. 386, 394, 377 S.E.2d 298, 302 (1989) curative instructions usually cure any prejudice caused by the admission of incompetent evidence.

Three witnesses testified as to their interpretations of a video, depicting the outside of Chastity's at 12:05:05–12:05:06 a.m. on the night in question (which is the precise time when John John was shot). Two witnesses, Donald Hawkins (a bouncer), and an Officer Gwyn, testified they saw a flash of light coming from the vehicle. The third witness, Officer Linfert testified he saw a shot fired from the vehicle, later

clarifying that "obviously we saw the video where the shot was fired from inside the vehicle."

In response to Herring's objections to this testimony, the trial judge issued a curative instruction to the jury in each instance, to the effect that the witness could not give an opinion as to whether or not the flash was a gunshot, and that the jury should strike any such inference from its memory. The trial court instructed the jury that "you·are the only ones who can draw from conclusions from what you saw on the tape and his testimony in this regard." He stated, further:

It's the same instruction I gave you with regard to another witness that looked at the same video and saw what he thought was—one said a light, one said a shot. That's an opinion. Just take it at that. Nobody saw the shot fired based on the testimony we've heard so far. It's all from the video. You are going to have the video. You can look at it. You can determine whatever you choose to determine from it.

As to Gwyn's testimony, the trial court re-instructed, "this witness has repeated something that another witness said regarding a light or a flash. You are not to interpret that as any evidence of a gunshot wound again or· a gunshot. It is your responsibility to see what you see on the video, if you see anything. This witness has merely told you ·what he thinks he saw."

We find the trial court's curative instructions sufficient to cure any prejudice, such that there was no·error in denying Herring's motions for a mistrial. *State v. Kelsey*, 331 S.C. 50, 502 S.E.2d 63 (1998) (grant of a mistrial is an extreme measure which should be taken only where an incident is so grievous that prejudicial effect can be removed in no other way); *Dawkins, supra.*

Herring's convictions and sentences are affirmed.[7]

**AFFIRMED.**

---

7. The remaining issues are affirmed pursuant to SCACR Rule 220(B)(1) and the following authorities: Issue 4 (failure to charge the law of accident)—*State v. Burriss*, 334 S.C. 256, 259, 513 S.E.2d 104, 106 (1999) (for homicide to be excusable on the ground of accident, it must be shown that the killing was unintentional, the defendant was acting lawfully, and due care was exercised in the handling of the weapon);

218

TOAL, C.J. and BEATTY, J., concur.

KITTREDGE, J., concurring in a separate opinion in which PLEICONES, J., concurs.

Justice KITTREDGE, concurring.

I concur in affirming the convictions and sentence of H. Dewain Herring. I join the majority in all respects save its determination concerning the initial search. I disagree that, from an objective standard, exigent circumstances existed upon the arrival of law enforcement at Herring's residence two hours after the shooting of John Johnson at Chastity's strip club.

What the majority characterizes as a "peek by police into [Herring's] garage" was, in my judgment, an unwarranted trespass and warrantless search. Upon the arrival of the police at Herring's residence approximately two hours after the crime, exigent circumstances for Fourth Amendment purposes did not exist. More to the point, nothing occurred at the residence to create an exigency to justify a warrantless search. There was neither hot pursuit, nor an imminent threat of danger to police or others, nor other conditions that reasonably fit exigent circumstances jurisprudence. *See State v. Abdullah*, 357 S.C. 344, 351, 592 S.E.2d 344, 348 (Ct.App. 2004) (discussing law of exigent circumstances).

*State v. Burkhart*, 350 S.C. 252, 565 S.E.2d 298 (2002) (to warrant reversal, trial court's refusal to give requested charge must be both erroneous and prejudicial to defendant): Issue 5 (involuntary manslaughter instruction)—*McKnight v. State*, 378 S.C. 33, 661 S.E.2d 354 (2008) (failure to give requested jury instructions is not prejudicial error where instructions given adequately cover the law): Issue 6 (*State v. Mouzon* instruction)—*State v. Reese*, 370 S.C. 31, 633 S.E.2d 898 (2006) (upholding *Mouzon* instruction); *Battle v. State*, 382 S.C. 197, 675 S.E.2d 736 (2009) (in determining prejudiced from jury instructions, court must find that, viewing the charge in its entirety and not in isolation, there is a reasonable likelihood that the jury applied the instruction in a way that violates the Constitution): Issue 7 (directed verdict)—*State v. Pittman*, 373 S.C. 527, 647 S.E.2d 144 (2007) (if State presents any evidence from which the defendant's guilt can be fairly and logically deduced, case must go to the jury): Issue 8 (cumulative error)—*State v. Gaines*, 380 S.C. 23, 667 S.E.2d 728 (2008) (to qualify for reversal on ground of cumulative effect of trial errors, defendant must demonstrate errors adversely affected right to fair trial).

The majority acknowledges that at the time of "Officer Linfert's peek into the garage ... [,][i]t is undisputed that police had knowledge of Herring's identity, his residence, the make and model of his vehicle, and his license tag number." The police responded to this purported exigent circumstance by ringing the doorbell. When no one answered the doorbell, police "stationed men at the house and went to obtain a warrant." Even from a subjective point, it is clear that law enforcement did not harbor the view that exigent circumstances justified a warrantless search.

Although I believe the peek into the garage constituted an illegal search, I agree with the majority that the search yielded no evidence. The evidence at the residence linking Herring to the shooting was seized as a result of the subsequent valid SLED search warrant.

PLEICONES, J., concurs.