717 S.E.2d 614

**The STATE, Respondent,**

v.

**Jerome CHISHOLM, Appellant.**

**No. 4899.**

Court of Appeals of South Carolina.

Heard Sept. 14, 2011.

Decided Oct. 26, 2011.

260

Appellate Defender Robert Pachak, of Columbia, for Appellant.

Attorney General Alan Wilson, Chief Deputy Attorney General John W. McIntosh, Assistant Deputy Attorney General Salley W. Elliott, Assistant Deputy Attorney General Harold M. Coombs, Jr., all of Columbia; and Solicitor Jerry W. Peace, of Greenwood, for Respondent.

HUFF, J.

Appellant, Jerome Chisholm, appeals his conviction of criminal sexual conduct (CSC) with a minor in the first degree, asserting (1) the State lacked probable cause to obtain oral swabs from him for DNA comparison, (2) the trial court erred in failing to exclude Human Immunodeficiency Virus (HIV) test results when no chain of custody was established, (3) the trial court erred in failing to exclude HIV test results because the probative value was substantially outweighed by the danger of unfair prejudice, and (4) the trial court erred in overruling defense counsel's motion for a mistrial after the child victim's treating doctor testified the child told her Chisholm "did something bad," as this testimony amounted to improper hearsay. We affirm.

## FACTUAL/PROCEDURAL BACKGROUND

The mother of the victim (Mother) testified that on Saturday morning, September 17, 2005, Chisholm came to the home she shared with her six year-old daughter (Victim) and Mother and Chisholm's two year-old son. Mother and the two children were up early that morning, and Mother had already made her bed by the time Chisholm arrived. Mother received a phone call and went to her back porch to take the call, which lasted five to ten minutes. When Mother returned inside the home, the children were not in their bedroom where she left them. Mother looked in her bedroom, where she found her son and Chisholm in her bed, underneath the covers. Mother did not see Victim, and when she inquired where Victim was, Chisholm did not answer, but he had a "crazy look." Mother then noticed Victim's hair bow sticking out from under the top of the covers. When Mother pulled the covers back, she observed Victim face down in the bed, with her underwear and shorts pulled down and "Chisholm's penis hanging down between his legs and inside [her] child's butt." Mother lifted Victim and put her clothes back on her. She tried to call

police, but was thwarted by Chisholm, who would not let Mother leave the home either. Mother sent Victim down the street to her sister-in-law's home, and Mother eventually made it there as well. After talking with police, Mother transported Victim to the hospital for a sexual assault examination.

Victim, who was ten years old at the time of the trial, also testified concerning the incident. Victim stated that on Saturday, September 17, she and her brother were playing in their room at Mother's house. Her brother's father, Chisholm, put her in the bed, turned her over from her back to her stomach, and got on her. At this time, Chisholm had pulled Victim's shorts and underwear down to her knees. Victim testified Chisholm put his penis inside her, "in [her] butt." Mother walked in, pulled Victim up, and took Victim to her aunt's house to call the police. After she talked to the police, Mother took her to the hospital where she underwent an examination. Thereafter, Victim went to see Dr. Pritchard for another examination.

Victim was seen in the emergency room that same day and was examined following her complaint of sexual assault. Included with the sexual assault kit in the evidence turned over to law enforcement was Victim's underwear. Victim had an external vaginal and rectal exam at the emergency room, but because of her young age she was referred to "The Child's Place" for an internal examination. Nothing out of the ordinary was noted from her emergency room examination.

South Carolina Law Enforcement Division (SLED) Agent Kenneth L. Bogan, who was qualified as an expert in the field of DNA analysis, testified regarding his analysis of the various items submitted in regard to Victim's emergency room visit. Agent Bogan found no semen on the vaginal and rectal smears and swabs, but did find the presence of blood on the vaginal swab. Upon inspecting Victim's underwear, he observed what he believed to be a blood stain. A presumptive analysis for the presence of blood was positive. Agent Bogan proceeded to extract DNA from the underwear stain and found a mixture of DNA from two individuals, one being consistent with that of Victim and the other belonging to an unidentified male. Agent Bogan then requested a DNA standard from any likely suspects in the case. After receiving a known DNA standard

in the form of buccal swabs from Chisholm, Agent Bogan made a comparison of Chisholm's DNA to the mixed sample taken from Victim's underwear, and determined the DNA profile from the unidentified male matched the DNA of Chisholm. Further analysis revealed there was semen present in the stain, and the DNA profile from the semen matched Chisholm's DNA profile.

Pediatrician Dr. Lyle Pritchard, who was qualified as an expert in child sexual assault examination, testified Victim was referred to her by law enforcement for a medical exam for possible child sexual abuse. Dr. Pritchard examined Victim on October 12, 2005. At that time, Victim complained of genital discomfort and pain. Child had a normal genital exam, but Dr. Pritchard stated this was common in cases where children had been sexually abused, particularly when there is a time lapse between the alleged trauma and her examination, as mucosal skin heals very quickly. Dr. Pritchard agreed that the records from the hospital indicated Victim had a normal exam on the day the allegations were reported, but explained the hospital did not use a special instrument for examination, called a the culpascope, in Victims' exam. Rather, the hospital personnel just looked at the skin on the outside of the bottom. Dr. Pritchard further testified she tested Victim for certain sexually transmitted diseases, and the HIV test came back positive. She noted that children can become HIV positive in three major ways: (1) from a congenital infection where the mother passes it on to the baby in utero or from the baby passing through the birth canal; (2) from a blood transfusion; or (3) from sexual contact. Dr. Pritchard noted Mother's HIV testing from her pregnancy with Victim and her pregnancy with Victim's younger brother were both negative, and found no history of Victim having a blood transfusion. Therefore, based on Victim's history of sexual contact and her positive HIV test, Dr. Pritchard diagnosed Victim with sexual abuse.

Finally, the State presented the testimony of Jean Banks, Greenwood County Health Department's administrative supervisor and the supervisor of medical records. Banks testified clients would have their blood drawn by a nurse at the Health Department, and it would then be sent by courier to the DHEC lab in Columbia where it is tested. The results are then sent from Columbia to a printer at the Health Depart-

ment, where the results are printed out and maintained in a file at the Health Department. These records are kept by the Health Department in the normal course of business. The Health Department's records show Victim had her blood collected on October 21, 2005, which showed Victim was HIV positive, and Chisholm had his blood collected on November 14, 2005, and he likewise tested positive for HIV. Banks admitted she did not have the names of the nurse, courier, the person who ran the test, or anyone who handled the blood before testing. She stated, however, that DHEC had procedures in place in terms of handling, packaging and transporting to keep the blood samples straight.

## ISSUES

1. Whether the State lacked probable cause to obtain oral swabs from Chisholm when there was insufficient evidence to establish that the blood found in Victim's underwear was the result of trauma caused by the alleged assault.

2. Whether the trial court erred in failing to exclude the HIV test results when no chain of custody was established.

3. Whether the trial court erred in failing to exclude HIV test results when the probative value of such evidence was substantially outweighed by the danger of unfair prejudice.

4. Whether the trial court erred in overruling defense counsel's motion for a mistrial after Dr. Pritchard testified that Victim told her Chisholm did something bad, because this testimony was improper hearsay.

## STANDARD OF REVIEW

In criminal cases, this court sits to review errors of law only. *State v. Wilson*, 345 S.C. 1, 5, 545 S.E.2d 827, 829 (2001). The admission or exclusion of evidence is within the discretion of the trial court and will not be disturbed on appeal absent an abuse of that discretion. *State v. Winkler*, 388 S.C. 574, 583, 698 S.E.2d 596, 601 (2010). An abuse of discretion occurs when the trial court's conclusions either lack evidentiary support or are controlled by an error of law. *Id.* "Similarly, whether to grant or deny a mistrial is within the discretion of the trial court and will not be reversed on appeal absent an

abuse of discretion." *State v. Herring,* 387 S.C. 201, 216, 692 S.E.2d 490, 498 (2009). A mistrial should be granted only when absolutely necessary, and a defendant must show both error and resulting prejudice to be entitled to a mistrial. *State v. Harris,* 340 S.C. 59, 63, 530 S.E.2d 626, 628 (2000).

## LAW/ANALYSIS

### I. Probable Cause to Obtain Oral DNA Swabs

The record shows that in July 2007, the State sought an order requiring Chisholm to submit to a blood draw for the purpose of DNA comparison pursuant to section 17–13–140 of the South Carolina Code (2003). At a hearing before Judge Goldsmith on July 25, 2007, the State presented the testimony of Officer Vernon Peppers, who testified Mother reported finding Chisholm in a sexual situation with her six-year-old daughter, noting Mother indicated she pulled the bed sheets back and discovered her daughter's panties around her ankles with Chisholm behind the child with his penis in his hand. Officer Peppers testified he spoke with SLED Agent Bogan, who analyzed Victim's underwear and found a blood stain in them. On the blood stain, Agent Bogan identified Victim's blood, "along with an unidentified male's DNA." Agent Bogan therefore requested a DNA swab from the defendant to make a comparison to the stain found in Victim's underwear. Officer Peppers acknowledged the nurse at the hospital indicated there was no evidence of trauma in the visual examination of Victim. However, he further testified Victim was referred to "The Child's Place" because the hospital was unable to perform a vaginal exam on Victim since the hospital did not have the necessary equipment for such an examination on a child her age.

Chisholm opposed the State's motion arguing, in part, that the State failed to establish probable cause that a crime had taken place as there was no evidence of any trauma to Victim; there was evidence that Victim was in bed with a male sibling such that the male blood could have come from another source; and there was "nothing in the record to establish that the underwear was clean and contaminated with blood." Judge Goldsmith found the State demonstrated probable cause existed to believe Chisholm committed the crime of CSC

with a minor, that relevant and material evidence was involved which necessitated the comparison of Chisholm's blood sample with that taken from the crime scene, and that the swab method was a safe and reliable method for obtaining DNA. He further found the crime involved was of a serious nature. Judge Goldsmith therefore ordered Chisholm provide an oral swab to the police in order to enable comparison with the blood evidence.

On appeal, Chisholm contends the State lacked probable cause to obtain oral swabs from him for DNA comparison because "there was no evidence to establish what caused the blood to be on the underwear and how long it was there," and therefore, there was only speculation that it was Chisholm's blood. He cites *State v. Baccus,* 367 S.C. 41, 625 S.E.2d 216 (2006) for the proposition that there was no substantial basis upon which to conclude that probable cause existed.

■■■■ A search warrant may issue only upon a finding of probable cause, and it is the duty of the reviewing court to ensure the issuing official had a substantial basis upon which to conclude that probable cause existed. *Id.* at 50, 625 S.E.2d at 221. "A court order issued pursuant to § 17–13–140, which stands in place of a search warrant, should only be issued upon a finding of probable cause, which is supported by oath or affirmation." *Id.* at 54–55, 625 S.E.2d at 223. "An order issued pursuant to § 17–13–140 that allows the government to procure evidence from a person's body constitutes a search and seizure under the Fourth Amendment," and must comply with constitutional and statutory guidelines. *Id.* at 53, 625 S.E.2d at 222. Considerations for determining whether or not there exists probable cause to permit the acquisition of such nontestimonial identification evidence include the following elements: (1) probable cause to believe the suspect has committed the crime; (2) a clear indication that relevant material evidence will be found; and (3) the method used to secure it is safe and reliable. *Id.* at 53–54, 625 S.E.2d at 222–23. "Additional factors to be weighed are the seriousness of the crime and the importance of the evidence to the investigation." *Id.* at 54, 625 S.E.2d at 223. "The judge is required to balance the necessity for acquiring involuntary nontestimonial identification evidence against constitutional safeguards prohibiting unreasonable bodily intrusions, searches, and seizures." *Id.*

■ The record shows Judge Goldsmith was presented with evidence that Mother found Chisholm in a "sexual situation" with the six-year-old Victim, discovering him in bed with her daughter, whose body was mostly hidden under the covers, and when Mother pulled the covers away, she found Victim bent over, with her underwear pulled down and Chisholm behind Victim with his penis in his hand. Additionally, the State presented evidence to Judge Goldsmith that Victim's clothing was collected at the hospital following this incident, Officer Peppers submitted the clothing to SLED, and the SLED agent who analyzed Victim's underwear found a blood stain in her underwear that contained Victim's blood, along with the DNA of an unidentified male. Judge Goldsmith properly considered the necessary elements in determining whether probable cause existed, and the record supports these findings. Accordingly, we find there was a substantial basis upon which to conclude that probable cause existed for the issuance of the order.

## II. Failure to Exclude HIV Test Results Based on Chain of Custody

Prior to trial, Judge Maddox granted the State's motion requiring Chisholm to submit to an HIV blood test, noting Chisholm had been charged with CSC with a minor and Victim's sexual assault examination indicated the child had the HIV virus.[1] Thereafter, Chisholm sought to exclude HIV test results, maintaining the State was required to supply the chain of custody before the results could be admitted.[2] The trial judge disagreed, ruling the results were admissible as business records under *Ex parte Dep't of Health & Envtl. Control*, 350 S.C. 243, 565 S.E.2d 293 (2002) (hereinafter *Ex parte DHEC*).

On appeal, Chisholm contends the trial court erred in failing to exclude the HIV test results because no competent chain of custody existed. He notes that Banks testified she did not have any names of the persons who drew the blood, transport-

---

1. It appears as though Chisholm actually consented to this blood test.

2. Although Chisholm's argument to the trial judge focused more on the admission of Chisholm's HIV test results, he also raised the chain of custody argument as to Victim's HIV test.

ed the blood to Columbia, performed the tests, or actually handled the blood. He argues the trial court erroneously relied upon *Ex parte DHEC*, as that case was distinguishable from the case at hand inasmuch as *Ex parte DHEC* dealt with HIV tests taken for purposes of medical diagnosis before any charges were pending. Chisholm argues charges were already pending against him when the State sought and administered the test, the State's purpose in requesting the test was to seek evidence as to his guilt, and the test was not performed for purposes of diagnosis and treatment. He therefore maintains that *Ex parte DHEC* does not apply, and the State was required to establish a complete chain of custody.

In *Ex parte DHEC*, the State sought to prove that defendant Doe had knowingly exposed the minor victim to HIV. *Id.* at 246, 565 S.E.2d at 295. The State filed a motion seeking to compel DHEC to, among other things, release the names and addresses of any possible chain of custody witnesses in the matter. *Id.* After the circuit court ordered the release of the names and access to all possible chain of custody witnesses, and this court affirmed that portion of the circuit court's order, DHEC petitioned the supreme court for certiorari, which was granted. *Id.* at 246–47, 565 S.E.2d at 294–95. The State maintained it was required by the South Carolina Rules of Evidence to establish a chain of custody to admit Doe's HIV blood test at trial, while DHEC argued the exception to the rule against hearsay contained in Rule 803(6), SCRE allowed Doe's HIV test results to be admitted into evidence as business records without the requirement of establishing a chain of custody. *Id.* at 247, 565 S.E.2d at 295. The supreme court disagreed with the State's position, but agreed with DHEC. *Id.* The supreme court specifically determined "the procedure for admitting business records would afford sufficient indicia of reliability to admit HIV test results without a chain of custody." *Id.* at 249, 565 S.E.2d at 297.

In addressing the issue, the supreme court noted that our courts consistently require a chain of custody in criminal prosecutions to prove the samples analyzed are, in fact, those of the defendant. *Id.* at 248, 565 S.E.2d at 296. However, it further differentiated HIV test results from those blood and urine samples taken at the time of an accident or other crime such as in driving under the influence (DUI) cases. *Id.*

Specifically, the court noted that DUI cases "involve time-sensitive tests taken at the time of an arrest or an accident that cannot·be replicated outside of that time frame," as a defendant's blood alcohol level could not be re-tested at a later time with an accurate result, and thus such cases require a chain of custody. *Id.* at 248–49, 565 S.E.2d at 296. "HIV test results, on the other hand, can be confirmed or proved false by re-testing at a later date, as HIV is a permanent condition, unlike the level of alcohol or drugs in the bloodstream." *Id.* at 249, 565 S.E.2d at 296. Based upon this distinction, the supreme court found the admission of HIV test results was not controlled by the line of cases dealing with drug and alcohol tests. *Id.*

It should be noted, however, that the supreme court's decision was also premised upon the fact that "[t]he trustworthiness of medical records is presumed, based on the fact that the test is relied on for diagnosis and treatment." *Id.* at 250, 565 S.E.2d at 297. The rationale for admitting laboratory test results as business records is that "if it is sufficiently trustworthy to be relied upon for medical treatment, it is sufficiently trustworthy to be admitted as a business record." *Id.* The court in *Ex parte DHEC* found this rationale persuasive and held Doe's HIV tests were admissible as business records, observing that the blood test was taken by DHEC personnel for the purpose of diagnosis and was relied upon for subsequent diagnosis, treatment, and counseling; that Doe was not tested by DHEC for purposes of litigation; and he was tested voluntarily before any charges were pending against him. *Id.*

However, the supreme court did not center its decision in *Ex parte DHEC* solely on the basis that Doe's HIV blood test was taken for the purpose of diagnosis and treatment and that Doe was not tested by DHEC for the purposes of litigation and charges were not pending at the time of the test. Rather, the court immediately thereafter stated as follows:

> Further, Doe could be retested at any time to refute the evidence presented against him at trial. If Doe tested negative at the time of trial, the DHEC test results could be ruled out as a false positive as HIV is a permanent condition. A person charged with DUI based on a blood alcohol test taken at the time of his arrest has no such protection

and, therefore, needs the indicia of reliability provided by a chain of custody.

*Id.*

Based upon the supreme court's opinion in *Ex parte DHEC*, it is not clear whether that court intended to provide that no chain of custody is necessary for the submission of the results of HIV testing performed by DHEC, as HIV tests are distinguishable from drug and alcohol prosecution tests since HIV is a permanent condition and the test could be replicated, or whether the decision would also require the test be taken, not for purposes of litigation, but for medical diagnosis before any charges are pending in order for the HIV test results to be admissible without a chain of custody. However, we find it unnecessary to make that determination in the case at hand, as we hold that any error in the admission of the HIV test results was harmless in light of the overwhelming evidence of Chisholm's guilt.

"Generally, appellate courts will not set aside convictions due to insubstantial errors not affecting the result." *State v. Sims*, 387 S.C. 557, 567, 694 S.E.2d 9, 14 (2010) (quoting *State v. Pagan*, 369 S.C. 201, 212, 631 S.E.2d 262, 267 (2006)). "When guilt is conclusively proven by competent evidence, such that no other rational conclusion could be reached, [the appellate court] will not set aside a conviction for insubstantial errors not affecting the result." *Baccus*, 367 S.C. at 55, 625 S.E.2d at 223.

█ Here, the State presented evidence from Victim that at the time in question, Chisholm pulled Victim's shorts and underwear down to her knees, placed her in the bed, turned her over on her stomach, got on her and put his penis inside her "butt." Mother testified as an eyewitness, stating she discovered Chisholm in her bed underneath the covers, that Chisholm failed to respond when she asked where Victim was, she then noticed Victim's hair bow sticking out from under the top of the covers, and when she pulled the covers back, she observed Victim face down in the bed, with her underwear and shorts pulled down and "Chisholm's penis hanging down between his legs and inside [her] child's butt." Finally, forensic evidence revealed a vaginal swab collected on the day of the incident from Victim tested positive for blood, and Victim's

underwear, also collected the day of the incident, contained a stain which tests proved to contain a mixture of Victim's blood and Chisholm's semen. Accordingly, admission of the HIV test result, even if erroneous, was harmless. *See State v. Herring*, 387 S.C. 201, 215–16, 692 S.E.2d 490, 497 (2009) (holding admission of evidence seized in search, even if erroneous, was harmless where there was overwhelming evidence of guilt); *State v. Tench*, 353 S.C. 531, 537, 579 S.E.2d 314, 317 (2003) (finding any error in admission of the seized evidence harmless beyond a reasonable doubt given the abundant evidence of appellant's guilt); *State v. Woods*, 376 S.C. 125, 129, 654 S.E.2d 867, 869 (Ct.App.2007) (finding error in admission of defendant's hair, blood, and saliva samples obtained through an order that was defective on its face was harmless in light of overwhelming evidence of defendant's guilt).

### III. Failure to Exclude HIV Test Results Based on Rule 403, SCRE

At trial, Chisholm requested the trial court rule on whether the unfair prejudice outweighed the probative value of the HIV test results. In considering Rule 403, SCRE, the trial court determined the HIV test results were relevant, and would not unduly prejudice Chisholm. On appeal, Chisholm argues the State did not need the HIV test results to prove CSC with a minor, and he was not charged with knowingly giving Victim HIV. He contends the trial court's ruling in this regard denied him a fair trial and was prejudicial, asserting "[t]here was no way for the jury not to take into consideration the HIV test results in reaching their verdict." The State counters that the HIV test results were probative evidence of the sexual battery committed on Victim.

Generally, all relevant evidence is admissible. Rule 402, SCRE. However, relevant evidence must be excluded if the danger of unfair prejudice substantially outweighs the probative value of the evidence. Rule 403, SCRE; *State v. Wiles*, 383 S.C. 151, 158, 679 S.E.2d 172, 176 (2009). "Unfair prejudice means an undue tendency to suggest decision on an improper basis." *Wiles*, 383 S.C. at 158, 679 S.E.2d at 176. An appellate court reviews Rule 403, SCRE balancing determinations pursuant to the abuse of discretion standard, and

gives great deference to the trial court's decision. *State v. Myers*, 359 S.C. 40, 48, 596 S.E.2d 488, 492 (2004).

■ Here, as noted by the State, Chisholm sought to establish there was no battery upon Victim, maintaining there was no evidence of injury or trauma to show penetration. The State sought to counter that position by presenting Dr. Pritchard's testimony that transmission of HIV during sexual contact required an exchange of body fluids, and blood or semen could mix as a result of a "very small micro trauma," thereby showing the HIV test results were probative evidence of the sexual battery committed on Victim. Therefore, the evidence of the HIV test results was probative of whether Chisholm committed a sexual battery upon Victim. Further, giving deference to the trial court's decision, we do not believe there was an undue tendency of the HIV test results evidence to suggest a decision on an improper basis which substantially outweighed the probative value of the evidence. At any rate, as previously discussed, given the overwhelming evidence, including the testimony of Victim, the eyewitness testimony of Mother, and the DNA evidence showing a mixture of Victim's blood and Chisholm's semen found in Victim's underwear following the incident of Chisholm's guilt, any error in the admission of the HIV test results would be harmless. Accordingly, we find no reversible error.

### IV. Motion for Mistrial Based on Improper Hearsay

Finally, Chisholm argues the trial court erred in overruling his motion for a mistrial after Dr. Pritchard testified Victim told her appellant "did something bad," as this testimony was improper hearsay. He contends this improper corroboration evidence cannot be harmless, because it is the cumulative effect which enhances the devastating impact of improper corroboration.

During direct examination of Dr. Pritchard, when the solicitor asked about the history given to her, the doctor stated she asked the patient about why she was brought there, and Victim told Dr. Pritchard "she and her brother had gotten cold and they got underneath the covers and then Rome did something bad." The solicitor immediately interjected in an apparent attempt to stop the testimony, and defense counsel

requested he be heard on a matter of law. The trial court took up the matter outside the jury's presence, at which time defense counsel maintained it was improper for Dr. Pritchard to testify as to identity, which went beyond the nonhearsay exception of time and place, and asserted "Rome" was an obvious nickname for Jerome. Although acknowledging the testimony was improper, the trial court found other witnesses had consistently identified Chisholm as the perpetrator such that the comment was cumulative and harmless. Noting the problem was caught quickly, the trial court indicated a curative instruction might serve to highlight the improper testimony, but stated he would give such instruction if requested. Defense counsel argued a curative instruction would not cure the harm, and asked instead for a mistrial. The trial court found the full name of Chisholm was not given, both the solicitor and defense counsel stopped the testimony, and that Victim and Mother both identified Chisholm as the perpetrator such that the comment was harmless. It therefore found no basis for a mistrial.

 The decision to grant or deny a motion for a mistrial is a matter within the sound discretion of the trial judge, whose decision will not be disturbed on appeal absent an abuse of discretion amounting to an error of law. *State v. Council,* 335 S.C. 1, 12, 515 S.E.2d 508, 514 (1999). A mistrial should be granted only when absolutely necessary. *Id.* at 13, 515 S.E.2d at 514. "In order to receive a mistrial, the defendant must show both error and resulting prejudice." *Id.* "The grant of a motion for a mistrial is an extreme measure which should be taken only where an incident is so grievous that the prejudicial effect can be removed in no other way." *Herring,* 387 S.C. at 216, 692 S.E.2d at 498.

 Here, it is questionable whether the jury even understood that the name "Rome" referred to Chisholm, as there is nothing in the record before us to indicate that Chisholm ever used the name "Rome" or that the witnesses knew him by that name. Furthermore, the comment was fleeting, with both the solicitor and defense counsel immediately stopping the testimony from going any further. Additionally, even if the jury understood the name "Rome" to refer to Chisholm, the properly admitted testimony of both Victim and Mother identified

Chisholm as the perpetrator such that the comment would have been harmless. *See State v. Price,* 368 S.C. 494, 499, 629 S.E.2d 363, 366 (2006) (noting the admission of improper hearsay evidence is harmless where the evidence is merely cumulative to other evidence). Accordingly, we find no abuse of discretion in the trial court's denial of Chisholm's motion for a mistrial. We further find, as previously stated, there is overwhelming evidence of Chisholm's guilt such that any error in the brief comment regarding "Rome" would be harmless. *See id.* (holding, where a review of the entire record establishes the error is harmless beyond a reasonable doubt, the conviction should not be reversed).

## CONCLUSION

For the foregoing reasons, Chisholm's conviction is **AFFIRMED.**

PIEPER and LOCKEMY, JJ., concur.