727 S.E.2d 761

The STATE, Respondent,

v.

Daniel J. JENKINS, Appellant.

No. 4958.

Court of Appeals of South Carolina.

Heard Dec. 6, 2011.

Decided March 28, 2012.

Withdrawn, Substituted, and Refiled June 20, 2012.

216

218

Appellate Defender Kathrine H. Hudgins, of Columbia, for Appellant.

Attorney General Alan M. Wilson, Chief Deputy Attorney General John W. McIntosh, Assistant Deputy Attorney General Salley W. Elliott, Assistant Attorney General Mark R. Farthing, all of Columbia; and Solicitor Scarlett Anne Wilson, of Charleston, for Respondent.

FEW, C.J.

Daniel Jenkins appeals his conviction for criminal sexual conduct in the first degree. Jenkins argues the trial court erred in denying his motion to suppress DNA test results because the affidavit offered in support of the search warrant for samples of his DNA did not meet the constitutional and statutory requirements for issuance of the warrant. We agree. We remand the case to the trial court for a factual determination of whether the inevitable discovery doctrine precludes application of the exclusionary rule in this case.

## I. Facts and Procedural History

The victim testified that on the evening of April 5, 2006, she came home from work, drank several beers, ordered a pizza, and fell asleep on her couch. She awoke approximately two hours later to a knock at the door. The victim recognized the man at her door as "Black," a man she sometimes saw at a neighborhood grocery store called Jabbers. Black frequently hung around outside Jabbers, and she occasionally said hello to him.

According to the victim, she answered the door, and Black asked if she wanted to get a beer with him. After the victim declined, Black asked her to put away her two dogs. She put away the dogs, and Black entered her house. The two of them sat on the victim's couch while Black smoked a cigarette, using a glass candle holder as an ashtray. Black then demanded she show him her genitals or else he would kill her. A struggle ensued in which Black hit the victim in the head and face multiple times with the candle holder, removed her pants and underwear, and raped her. Black told the victim "don't tell anyone or I will kill you," and left.

The victim explained that because she could not find her cordless phone, she ran down the street looking for help. Near Jabbers, the victim encountered a woman who asked her

what happened. At that moment, Black approached the victim, took her by the arm, and guided her to a hose so she could wash blood off of her face. Black then handed the victim her cordless phone. She ran home and called 911.

When the police arrived at the victim's house, she described the incident and gave them the name "Black." Within thirty minutes, police located Jenkins in an abandoned building across the street from Jabbers. The police brought the victim to the store parking lot, where she identified Jenkins as the man who raped her. After the victim identified Jenkins, she underwent a rape examination. The nurse who performed the examination observed a large amount of fluid in the victim's vagina, and she took evidence swabs of the victim's vagina and other parts of her body.

The next day, the police sought a search warrant for samples of Jenkins' blood and hair. A detective who responded to the victim's 911 call prepared the affidavit in support of the warrant. In the affidavit, the detective wrote only the following:

On 4–5–06 at approx. 2230hrs while at [victim's address], the subject Daniel Jerome Jenkins (BM, dob 6–17–60) did enter the victim's residence and threatened to kill her if she did not comply with his demands to perform oral sex on her. The victim attempted to fight the subject, however he overpowered her by striking her in and about her face using a glass candle holder. The subject then penetrated the victim's vagina with his tongue and penis. The DNA samples of blood, head hair, and pubic hair will be retrieved from the subject by a trained medical personnel in a medical facility. This collection of these sample [sic] will be conducted in a noninvasive manner.

The detective did not supplement the affidavit with oral testimony. The magistrate read the affidavit and signed the warrant. The police executed the warrant, obtaining blood and hair samples from Jenkins.

SLED analyzed Jenkins' samples and the swabs taken from the victim. A SLED forensic DNA analyst found semen on several swabs, including the vaginal swab. The analyst developed a DNA profile from the vaginal swab and compared it to a DNA profile developed from Jenkins' samples. The profiles

matched, with a one–in–8.6 quintillion [1] chance the semen came from an unrelated person.

At trial, the victim testified in the detail set out above that Jenkins raped her. Later in the trial, the State called the DNA analyst to testify to the results of the DNA comparison. After the trial court found the warrant was valid and denied Jenkins' motion to suppress, the witness testified to the results of the comparison and its degree of certainty.

The jury found Jenkins guilty. Because he had prior convictions for criminal sexual conduct in the first degree and carjacking, both "most serious offense[s]" under section 17–25–45(C)(1) of the South Carolina Code (Supp.2011), the trial court imposed a mandatory sentence of life in prison with no possibility of parole. *See* S.C.Code Ann. § 17–25–45(A)(1)(a) (Supp.2011).

## II. The Validity of the Search Warrant

A search warrant allowing the government to obtain evidence from a suspect's body is a search and seizure under the Fourth Amendment and, therefore, must comply with constitutional and statutory requirements. *State v. Baccus,* 367 S.C. 41, 53, 625 S.E.2d 216, 222 (2006). To secure a warrant for the acquisition of such evidence, the State must establish the following elements: (1) probable cause to believe the suspect committed the crime; (2) a clear indication that relevant evidence will be found; and (3) the method used to secure it is safe and reliable. 367 S.C. at 53–54, 625 S.E.2d at 223 (quoting *In re Snyder,* 308 S.C. 192, 195, 417 S.E.2d 572, 574 (1992) (per curiam)); *see also* S.C.Code Ann. § 17–13–140 (2003). The magistrate must also consider the seriousness of the crime and the importance of the evidence to the investigation, weighing " 'the necessity for acquiring involuntary non-testimonial identification evidence against constitutional safeguards prohibiting unreasonable bodily intrusions, searches, and seizures.' " *Baccus,* 367 S.C. at 54, 625 S.E.2d at 223 (quoting *Snyder,* 308 S.C. at 195, 417 S.E.2d at 574).

We find the affidavit, which was the only information presented to the magistrate in support of the warrant application,

---

**1.** The number representing one quintillion is a one followed by eighteen zeros. *Webster's New World College Dictionary* 1178 (4th ed.2008).

does not meet the requirements of *Baccus*. *See State v. Arnold*, 319 S.C. 256, 259, 460 S.E.2d 403, 405 (Ct.App.1995) (per curiam) (stating a court reviewing the validity of a warrant may consider only information presented to the magistrate who issued the warrant). In particular, we find the affidavit does not demonstrate that the police had probable cause to believe that Jenkins raped the victim or that Jenkins' DNA was relevant to the investigation. Therefore, we hold the trial court erred in finding the warrant was valid.

### A. Probable Cause that Jenkins Committed the Crime

A probable cause determination requires a magistrate to " 'make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before her, including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a fair probability that . . . evidence of a crime will be found in a particular place.' " *State v. Herring*, 387 S.C. 201, 212, 692 S.E.2d 490, 495–96 (2009) (quoting *Illinois v. Gates*, 462 U.S. 213, 238, 103 S.Ct. 2317, 2332, 76 L.Ed.2d 527 (1983)). On review, our duty is to ensure that the magistrate had a substantial basis for concluding probable cause existed. 387 S.C. at 212, 692 S.E.2d at 495; *see also State v. Weston*, 329 S.C. 287, 290, 494 S.E.2d 801, 802 (1997) (stating a reviewing court should give great deference to a magistrate's determination of probable cause). Considering the totality of the circumstances, we find the affidavit in this case did not provide the magistrate a substantial basis for concluding there was probable cause that Jenkins committed the crime.

First, the affidavit must set forth facts as to why the police believe the suspect whose DNA is sought is the person who committed the crime. *See State v. Smith*, 301 S.C. 371, 373, 392 S.E.2d 182, 183 (1990) (finding an affidavit defective because it "sets forth no facts as to *why* police believed Smith" committed the robbery). Applying that requirement in *Baccus*, our supreme court found the affidavit defective and therefore found there was an insufficient basis for a finding of probable cause. 367 S.C. at 52, 625 S.E.2d at 222. The court stated: "This affidavit fails to set forth any facts as to why police believed Appellant committed the crime. The language in the affidavit lacks [specificity] and contains conclusory

statements. Given the totality of the circumstances, we conclude the issuing magistrate did not have a substantial basis to find probable cause." *Id.* Similarly, the affidavit in this case lacks specificity and contains nothing more than conclusory statements. "The affidavit must set forth particular facts and circumstances underlying the existence of probable cause to allow the magistrate to make an independent evaluation of the matter." 367 S.C. at 50–51, 625 S.E.2d at 221 (citing *Franks v. Delaware,* 438 U.S. 154, 165, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978)). The affidavit in this case fails to meet the requirement of showing why the police believed Jenkins committed the crime.

Second, the affidavit does not set forth the source of the facts alleged in it. In *Smith,* the defendant sought to suppress a knife seized from his hotel room that was allegedly used in a robbery. 301 S.C. at 372, 392 S.E.2d at 183. The affidavit supporting the search warrant stated that the defendant committed the robbery, he had been staying in the hotel room, "and there is every reason to believe the weapon and clothes used in the robbery will be located in the room." *Id.* The affidavit also stated "[t]his information was confirmed in person by Sgt. Sherman. . . ." *Id.* Our supreme court found the affidavit "defective on its face," in part because "[a]lthough the record reveals that police relied upon information from an informant, there is no indication that this fact was made known to the magistrate. . . ." 301 S.C. at 373, 392 S.E.2d at 183. Similarly, the affidavit in this case is defective because it contains no indication as to where the detective obtained the information.

Nevertheless, the State argues that because this case involves a sex crime, the magistrate could reasonably have inferred the victim was the source of the information. We disagree. The law does not allow the State to justify a bodily intrusion on the possibility that a magistrate made a correct inference as to the source of the information in the affidavit. Rather, "[m]ere conclusory statements which give the magistrate no basis to make a judgment regarding probable cause are insufficient." *Smith,* 301 S.C. at 373, 392 S.E.2d at 183. Moreover, the complete absence of a source for any of the information makes a variety of scenarios possible. For example, the detective could have pieced together the information

from other officers, the victim's neighbors, or even an anonymous tip. This is precisely what the law forbids a magistrate from doing. The magistrate's "'action cannot be a mere ratification of the bare conclusions of others.'" *Id.* (quoting *Gates*, 462 U.S. at 239, 103 S.Ct. 2317).

Third, the affidavit does not contain even a conclusory assertion that the information or its source is reliable. *See Gates*, 462 U.S. at 238, 103 S.Ct. 2317 (stating the circumstances a magistrate must consider include the "veracity" of the persons supplying the information on which the warrant is based). "Without any information concerning the reliability of the informant, the inferences from the facts which lead to the complaint will be drawn not by a neutral and detached magistrate, as the Constitution requires, but instead, by a police officer engaged in the often competitive enterprise of ferreting out crime...." *State v. Johnson*, 302 S.C. 243, 248, 395 S.E.2d 167, 169 (1990) (citation and quotation marks omitted).

Viewing these deficiencies together and considering the totality of the circumstances, we find the police did not provide the magistrate a substantial basis on which to find probable cause to believe Jenkins committed this crime.

### B.   Clear Indication that Jenkins' Samples Are Relevant

The information presented to a magistrate to obtain a warrant for bodily intrusion must contain "a clear indication that relevant evidence will be found." *Baccus*, 367 S.C. at 53–54, 625 S.E.2d at 223. The trial court stated: "Clearly DNA or genetic material is ... evidence relevant to the question of the suspect's guilt on the crime of criminal sexual conduct in the first degree." However, this statement is true only if the police have DNA from the victim or the crime scene to which they can compare the suspect's DNA. Accordingly, to show that a suspect's DNA is relevant under the second element of *Baccus*, the State must show there is other DNA evidence in the case to which it can be compared, or in some other manner clearly indicate the relevance of the DNA sought.

The affidavit in this case does not contain any indication as to whether the police had other DNA evidence to which

Jenkins' DNA profile could be compared.[2] *Cf. State v. Chisholm,* 395 S.C. 259, 266–68, 717 S.E.2d 614, 617–18 (Ct.App. 2011) (affirming an order requiring defendant to provide a DNA sample where the State presented evidence to the magistrate that the victim's clothing contained the DNA of an unidentified male); *State v. Sanders,* 388 S.C. 292, 298, 696 S.E.2d 592, 595 (Ct.App.2009) (finding the second *Baccus* element met because the State showed it could compare defendant's blood sample to blood found on a victim's shirt); *State v. Simmons,* 384 S.C. 145, 176, 682 S.E.2d 19, 35–36 (Ct.App.2009) (affirming an order requiring defendant to provide a palm print because it could be compared to a palm print lifted from the car he was accused of stealing). Thus, the affidavit failed to clearly indicate the relevance of Jenkins' DNA.

### III. Whether the Trial Court's Error Was Harmless

The State argues any error in admitting the DNA comparison results was harmless in light of other evidence of Jenkins' guilt. "To deem an error harmless, this court must determine 'beyond a reasonable doubt the error complained of did not contribute to the verdict obtained.'" *State v. Fonseca,* 383 S.C. 640, 650, 681 S.E.2d 1, 6 (Ct.App.2009) (quoting *Taylor v. State,* 312 S.C. 179, 181, 439 S.E.2d 820, 821 (1993)), *aff'd,* 393 S.C. 229, 711 S.E.2d 906 (2011); *see also Baccus,* 367 S.C. at 55, 625 S.E.2d at 223 ("When guilt is conclusively proven by competent evidence, such that no other rational conclusion could be reached, this Court will not set aside a conviction for insubstantial errors not affecting the result."). In *Baccus,* the supreme court found the trial court's error in admitting the DNA to be harmless. 367 S.C. at 56, 625 S.E.2d at 224. As the court indicated, however, the other evidence in the case conclusively proved the defendant guilty.

> The State presented the testimony of [the victim's friend] who overheard Appellant tell the victim he was going to kill her and who overheard a pop and clicking sound. Additionally, the State presented evidence that Appellant's fingerprints matched fingerprints on the window sill of the broken

---

2. The detective who prepared the affidavit admitted that when she prepared it, she did not know the results of the victim's rape examination.

window in the victim's bedroom. Also, [a DNA analyst] testified the blood sample collected from Appellant on the night of his arrest matched the blood found on the swabs and cuttings from the door, blind, and sheet in the victim's house. Therefore, the blood evidence drawn pursuant to the court order which should have been excluded was cumulative.

367 S.C. at 55, 625 S.E.2d at 223–24.

In *Baccus,* the DNA match to the defendant would have been in evidence regardless of the trial court's ruling on the motion to suppress. The admissible DNA evidence, combined with the friend's testimony she heard a gunshot immediately after she heard the defendant tell the victim he was going to kill her, "conclusively" proved the defendant guilty and left no rational conclusion but that he was guilty of murder. 367 S.C. at 55–56, 625 S.E.2d at 224. Without the DNA in this case, on the other hand, the State would have been forced to rely heavily on the credibility of the victim. Jenkins' fingerprint in the victim's home proved he was there, the presence of fluids in her body proved someone had sex with her, and the facial injuries proved someone violently assaulted her. However, removing the DNA leaves only the victim's credibility to prove two key facts necessary for a conviction: that Jenkins was the person who had sex with her,[3] and that the sex was not consensual. *See State v. Jennings,* 394 S.C. 473, 480, 716 S.E.2d 91, 95 (2011) (stating "[b]ecause the [victim]'s credibility was the most critical determination of this case, we find the admission of the written reports was not harmless"), *reh'g denied,* (Oct. 19, 2011); 394 S.C. at 482, 716 S.E.2d at 96 (Kittredge, J., concurring) (stating "it may be a rare occurrence for the State to prove harmless error . . . in these

---

3. The State suggests that Jenkins argued the sex was consensual and thus conceded he had sex with the victim. We disagree. Jenkins' counsel cross-examined witnesses to elicit evidence that many of the victim's injuries were consistent with consensual sex, argued this evidence to the jury, argued that "all [the DNA] can do is tell you they had sex," and further argued several points supporting an inference the sex was consensual. We do not believe this rises to a concession. Rather, counsel is entitled to argue to the jury that the State has failed to prove an essential element of the crime—the sex was not consensual—without conceding the occurrence of sex.

circumstances").[4] We cannot find beyond a reasonable doubt that the DNA comparison results in this case, which the DNA analyst testified had a one–in–8.6 quintillion likelihood of error, did not contribute to or affect the verdict.[5]

## IV. Inevitable Discovery of Jenkins' DNA

As an additional sustaining ground, the State argues that even if the search was illegal because of the defective affidavit, the DNA evidence was admissible under the inevitable discovery doctrine. The inevitable discovery doctrine is an exception to the exclusionary rule which requires the State to establish by a preponderance of the evidence that the same evidence seized unlawfully would have been discovered inevitably by lawful means. *See State v. Brown,* 389 S.C. 473, 483, 698 S.E.2d 811, 816 (Ct.App.2010), *cert. granted,* (Dec. 15, 2011); *see also Nix v. Williams,* 467 U.S. 431, 447, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984) (holding evidence may be admitted despite a violation of the Fourth Amendment "if the government can prove that the evidence would have been obtained inevitably and, therefore, would have been admitted regardless of any overreaching by the police"). When the doctrine applies, the evidence will not be suppressed despite the fact it was obtained pursuant to an illegal search. *Brown,* 389 S.C. at 483, 698 S.E.2d at 816.

The State first argues that because probable cause did in fact exist, the inevitable discovery doctrine applies. We disagree. While the police could have presented evidence to the magistrate sufficient to establish probable cause, that does not satisfy the requirement that the State prove it would

---

4. Our finding that the error was not harmless is based on our analysis of the facts of this individual case, not based on any categorical rule. *See Jennings,* 394 S.C. at 482, 716 S.E.2d at 95–96 (Kittredge, J., concurring), *and* 394 S.C. at 483, 716 S.E.2d at 96 (Toal, C.J., dissenting) (collectively overruling *Jolly v. State,* 314 S.C. 17, 443 S.E.2d 566 (1994), to the extent *Jolly* imposes a categorical or per se rule regarding harmless error).

5. We acknowledge the DNA evidence does not bear directly on the question of whether the sex was consensual. However, the DNA corroborated the victim's testimony that it was Jenkins who had sex with her. Because the DNA bolstered her credibility on this important point, we cannot say the DNA did not contribute to her credibility as to whether the sex was consensual.

inevitably have discovered Jenkins' DNA. As the Fourth Circuit has stated: "The inevitable discovery doctrine cannot rescue evidence obtained via an unlawful search simply because probable cause existed to obtain a warrant when the government presents *no* evidence that the police would have obtained a warrant. Any other rule would emasculate the Fourth Amendment." *United States v. Allen,* 159 F.3d 832, 842 (4th Cir.1998).[6]

The State also argues that discovery of Jenkins' DNA was inevitable because the State DNA Identification Record Database Act required that Jenkins' DNA be tested for inclusion in the State DNA database. *See* S.C.Code Ann. § 23–3–610 (2007) (establishing State DNA database); § 23–3–620(A) (Supp.2011) (providing a person arrested for a felony must provide a DNA sample); § 23–3–620(B) (Supp.2011) (providing a prisoner may not be released until he provides a DNA sample); § 23–3–640 (2007) (requiring all DNA samples taken pursuant to the Act be submitted to SLED for testing and secure storage); § 23–3–650(A) (Supp.2011) (permitting SLED to make samples available to local law enforcement and solicitor's offices "in furtherance of an official investigation of a criminal offense"). The State contends on appeal that Jenkins was tested pursuant to the Act because of his prior conviction and imprisonment for criminal sexual conduct, and his DNA profile is included in the State DNA database. However, because the trial court ruled the search was legal, the State never had an opportunity to present evidence to prove its contention.[7]

---

**6.** *Allen* involved a situation where the police never sought a warrant in the first place. *See* 159 F.3d at 834–37. The difference between that situation and this case, where the police obtained a defective warrant, is immaterial as to the inevitable discovery doctrine. In both situations, allowing the doctrine to excuse the requirement of a valid warrant simply because the State can later establish that probable cause existed would render the Fourth Amendment meaningless.

**7.** The State's petition for rehearing includes an uncertified copy of a printout from SLED indicating the State DNA database contains Jenkins' DNA profile. The printout has not been authenticated under Rule 901(a), SCRE, is not part of the record on appeal, and contains no indication a DNA expert could actually use the profile. The State's contention that the printout proves its inevitable discovery claim misses the point of the inevitable discovery doctrine. The issue as to inevitable

██ The purpose of the exclusionary rule " 'is to deter—to compel respect for the constitutional guaranty in the only effectively available way—by removing the incentive to disregard it.' " *State v. Sachs,* 264 S.C. 541, 560–61, 216 S.E.2d 501, 511 (1975) (quoting *Elkins v. United States,* 364 U.S. 206, 217, 80 S.Ct. 1437, 4 L.Ed.2d 1669 (1960)). However, the exclusionary rule was not designed to apply to every violation of the Fourth Amendment. *See Weston,* 329 S.C. at 293, 494 S.E.2d at 804 ("Suppression is appropriate in only a few situations...."); *State v. McKnight,* 291 S.C. 110, 113, 352 S.E.2d 471, 473 (1987) ("Exclusion of evidence is not the only means available to insure that warrants are properly issued." (citing *Sachs,* 264 S.C. at 556, 216 S.E.2d at 509)). In *Sachs,* our supreme court observed "[t]he exclusionary rule is harsh medicine," and "[e]xclusion should be applied only where deterrence is clearly subserved." 264 S.C. at 566, 216 S.E.2d at 514. When the State has met its burden of proving it inevitably would have discovered the evidence, the "deterrence" purpose of the exclusionary rule is not "clearly subserved," *id.,* and " 'there is no rational basis to keep that evidence from the jury in order to ensure the fairness of the trial proceedings.' " *State v. Spears,* 393 S.C. 466, 482, 713 S.E.2d 324, 332 (Ct.App.2011) (quoting *Nix,* 467 U.S. at 447, 104 S.Ct. 2501). Therefore, the inevitable discovery doctrine represents an important policy determination that the "harsh medicine" of excluding probative evidence should be avoided when doing so does not advance the objectives of the exclusionary rule by deterring violation of constitutional rights. *See James v. Illinois,* 493 U.S. 307, 312, 110 S.Ct. 648, 107 L.Ed.2d 676 (1990) (noting the basis of exceptions to the exclusionary rule includes "the likelihood that admissibility of such evidence would encourage police misconduct").

---

discovery is not whether a state agency separate from the prosecutor has Jenkins' profile in its database. Rather, the doctrine places on the State the burden of proving that the law enforcement agencies investigating or the solicitor's office prosecuting Jenkins inevitably would have obtained Jenkins' genetic profile from this database and that the lawfully-obtained profile could be compared to the profile developed from the semen found in the victim. Standing alone, the printout establishes only that the solicitor's office or investigating agency *might have* obtained the profile from the State DNA database. The inevitable discovery doctrine requires the State to establish it inevitably *would have* obtained it and could have used it.

In this particular case, we find it appropriate to remand to the trial court for an evidentiary hearing as to whether the inevitable discovery doctrine applies. The issue is presented to us on appeal from the trial court's denial of Jenkins' suppression motion on the basis that the search was legal. Therefore, the State did not need to present evidence in support of the inevitable discovery doctrine to proceed with the trial. While it would have been possible for the State to make a record on this issue, doing so would have been impractical. As our supreme court has explained: "It would be inefficient and pointless to require a respondent to return to the judge and ask for a ruling on other arguments. . . . It also could violate the principle that a court usually should refrain from deciding unnecessary questions." *I'On, L.L.C. v. Town of Mt. Pleasant*, 338 S.C. 406, 419, 526 S.E.2d 716, 723 (2000). Given the important policy considerations behind the exclusionary rule and the inevitable discovery doctrine, we believe the determination of whether the illegally seized evidence of Jenkins' DNA must be suppressed should not be made by this court on a blank record. Rather, the determination should be made first by the trial court after an evidentiary hearing.[8] If the trial court determines on remand that the inevitable discovery doctrine applies, the conviction must be affirmed. If the trial court determines the doctrine does not apply, the illegally seized evidence must be suppressed, and Jenkins must receive a new trial.

## V. Conclusion

We find the trial court erred in finding the search warrant for samples of Jenkins' DNA was valid. The case is **RE-**

---

8. The appellate courts of South Carolina have addressed the inevitable discovery doctrine in only three published decisions. In two of the cases, the factual record before the appellate court was sufficient to enable the court to determine whether the State met its burden of proof. *Compare Spears*, 393 S.C. at 481, 713 S.E.2d at 332 (reviewing the trial court's ruling that the State met its burden of proving inevitable discovery), *and State v. McCord*, 349 S.C. 477, 485 n. 2, 562 S.E.2d 689, 693 n. 2 (Ct.App.2002) (noting the police would have inevitably discovered defendant's blood because they had a search warrant for a sample of it), *with Brown*, 389 S.C. at 483–84, 698 S.E.2d at 817 (noting standard procedures would allow for inventory search and thus discovery of the drugs, but finding the State did not present evidence it would have followed such a procedure).

**MANDED** for an evidentiary hearing on the applicability of the inevitable discovery doctrine and a determination of whether the illegally seized evidence should have been suppressed.

THOMAS and KONDUROS, JJ., concur.