*This opinion will be unpublished and may not be cited except as provided by Minn. Stat. § 480A.08, subd. 3 (2012).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A13-1297**

State of Minnesota,
Respondent,

vs.

Simeon Laderick Sharp,
Appellant.

**Filed July 21, 2014
Affirmed
Bjorkman, Judge**

Ramsey County District Court
File No. 62-CR-12-8267

Lori Swanson, Attorney General, St. Paul, Minnesota; and

John J. Choi, Ramsey County Attorney, Clayton M. Robinson, Jr., Assistant County Attorney, St. Paul, Minnesota (for respondent)

Cathryn Middlebrook, Chief Appellate Public Defender, Michael W. Kunkel, Assistant Public Defender, St. Paul, Minnesota (for appellant)

Considered and decided by Bjorkman, Presiding Judge; Ross, Judge; and Reilly, Judge.

**U N P U B L I S H E D   O P I N I O N**

**BJORKMAN**, Judge

Appellant challenges his convictions of being an ineligible person in possession of a firearm and making terroristic threats, arguing (1) the warrant for his DNA sample was

not supported by probable cause; (2) the evidence is insufficient to support the terroristic-threats conviction; (3) allowing the jury to replay the 911 recording during deliberations denied him a fair trial; and (4) the state committed prejudicial misconduct during its closing argument.  In a pro se supplemental brief, appellant argues that he was denied his speedy-trial right.  We affirm.

## FACTS

On October 11, 2012, St. Paul police received a 911 call from L.W., who reported being abused by her ex-boyfriend, appellant Simeon Laderick Sharp.  She told the 911 operator that she was following Sharp in her cousin J.H.'s vehicle because he had her car keys and she needed to go to work.  She directed officers to her home.

After she arrived at home, L.W. asked the 911 operator to "send police right away [because] I think he has a gun."  When the operator asked why L.W. thought Sharp had a gun, she replied that "[h]e's holding something by his stomach," and then "[h]e has a gun.  It's in his hand.  It's in his hand.  I'm scared my cousin's outside.  I'm so scared."  L.W. went on to say that Sharp was in the middle of the street with a gun and was yelling and "threatening us."

A man later identified as J.H. took the phone and said "This n--ger got a f--king tech 9 on him.  This n--ger got a big ass gun in his pants and a clip all like motherf--king 32 shots. . . .  So you need to come over."  L.W. took the phone again and said that Sharp had gone into or behind the house.  The call ended when the officers arrived at the scene.

St. Paul Police Officer Theresa Spencer was leaving the police station parking lot when she was flagged down by L.W. and J.H., who "jumped out [of their vehicle and]

2

start[ed] screaming, he's got a gun, he's got a gun." Officer Spencer went to L.W.'s home, less than half a block from the police station, and saw a man later identified as Sharp standing near a vehicle parked in the driveway. She secured Sharp and then interviewed L.W. while other officers searched Sharp and his vehicle.

Officer Spencer described L.W. as upset, crying, and "emotionally scared." L.W. told her that she and Sharp got into an argument earlier that morning during which Sharp grabbed her hair, ripping out some of her braids. L.W. also reported that Sharp choked her as she tried to escape. Officer Spencer "noticed a red area in the front of [L.W.'s] scalp where . . . braids were pulled out," and L.W. showed her a bite mark on her thigh. Photographs confirmed the missing hair and bite mark, and showed L.W. had blood in one eye.

L.W. told Officer Spencer that she fled to J.H.'s house, seeking his help in getting her keys back. L.W. then called Sharp's mother, who said that Sharp was at his sister's house. When L.W. and J.H. arrived there, Sharp led them on a high-speed chase that ended up at L.W.'s home. Sharp got out of the car and started walking toward them. L.W. told Officer Spencer that "she saw a gun in his waistband and that when he got close to the vehicle, he pulled the gun out and said that he was going to kill them." At that point, L.W. and J.H. drove to the nearby police station.

Officer David Kantorowicz handcuffed and pat searched Sharp and searched the car but did not find a gun. L.W. told the officers that "if the gun was not in the car, it would probably be in [L.W.'s house]." L.W. signed a consent-to-search form and

3

officers searched the house. Officer Kantorowicz found three nine-millimeter rounds in a bedroom and a gun under a kitchen cabinet.

Sharp was charged with one count of possession of a firearm by an ineligible person,[1] two counts of terroristic threats, and one count of domestic assault by strangulation. The police obtained a search warrant to collect Sharp's DNA to compare to samples that might be obtained from the gun. Of the three samples taken from the gun, one contained DNA from four or more people; Sharp could not be excluded as a contributor, but 92.7% of the general population could be. A second sample contained DNA from two or more people; Sharp could not be excluded although 99.99993% of the general population could be. The third sample contained no DNA.

One month later, L.W. recanted. She provided a written statement to Sharp's lawyer, in which she denies seeing Sharp with a gun and states that she only told the 911 operator that Sharp had a gun because she was frustrated that the officers were taking so long to arrive on scene. L.W.'s written statement indicates that Sharp restrained but did not choke her, she does not know how her other injuries had occurred, and Sharp did not live with her at her house.

At trial, L.W. testified that she owns the gun the officers found in her home and that she does not believe Sharp ever possessed a gun. On the morning of October 11, she got into an argument with Sharp, and she was trying to get her keys back from Sharp so that she could go to work. She testified that she does not remember telling the 911 operator that Sharp had assaulted her. She recalled telling the operator that Sharp had a

_____

[1] The parties stipulated that Sharp was ineligible to possess a firearm.

4

gun because she thought he might have been reaching for one, because J.H. said Sharp had a gun, and because she wanted to go to work. She did not recall speaking with Officer Spencer at the scene, and stated that she sustained her injuries during an earlier fight with a woman.

The jury found Sharp guilty of ineligible possession of a firearm and one count of making terroristic threats. The district court imposed concurrent sentences and this appeal follows.

## D E C I S I O N

### I. Probable cause supported the warrant authorizing the collection of Sharp's DNA.

A search warrant may be issued when the totality of the circumstances shows that "there is a fair probability that contraband or evidence of a crime will be found in a particular place." *State v. Zanter*, 535 N.W.2d 624, 633 (Minn. 1995) (quotation omitted). We afford great deference to "a district court's probable cause determination made in connection with the issuance of a search warrant." *State v. Rochefort*, 631 N.W.2d 802, 804 (Minn. 2001).

Sharp argues that the warrant to collect his DNA was not supported by adequate probable cause because, at the time it was issued, "it was unknown whether the recovered firearm actually had any DNA on it and whether the swabbings of it by police had collected a sample suitable for comparison." He asserts that "there thus existed *no* probability—fair or otherwise—that 'contraband or evidence of a crime' would be or could be discovered." We are not persuaded.

5

First, the warrant application and supporting affidavit establish a fair probability that Sharp's DNA would be found on the gun. The affidavit recounts L.W.'s statements that Sharp was holding a gun when he exited his vehicle, that he pointed the gun at a group of people standing outside, and that he put the gun in L.W.'s house. And the affidavit states that a gun was recovered from L.W.'s house and Sharp is not eligible to possess or carry a firearm.

Second, Sharp cites no controlling authority to support his assertion that a warrant seeking a DNA issue may not be issued unless the state has DNA evidence with which to make a comparison.[2] The warrant application concludes with the affiant's request to

> search the person of Simeon Laderick Sharp to obtain a buccal swab (oral DNA sample) **for further comparison to the possible DNA that may be collected** from the firearm . . . . This comparison may tend to include or exclude Simeon Laderick Sharp in this possession of a firearm incident in St. Paul, MN.

(Emphasis added.) Sharp asserts that the bolded language defeats a probable-cause determination. We have not found any cases directly on point. But in *State v. McBride*, our supreme court considered two warrants authorizing the police to search for "any correspondence" between the defendant and the mother of the alleged victim. 666

---

[2] Sharp cites *State v. Jenkins*, 727 S.E.2d 761 (S.C. Ct. App. 2012), in support of this theory. Cases from other states are not binding on this court, but may have persuasive value. *Mahowald v. Minn. Gas Co.*, 344 N.W.2d 856, 861 (Minn. 1984). But *Jenkins* is not persuasive because it relies on South Carolina caselaw requiring that "[t]he information presented to a magistrate to obtain a warrant for bodily intrusion must contain a clear indication that relevant evidence will be found." 727 S.E.2d at 766 (quotation omitted). South Carolina courts have concluded that in order to meet this requirement, the state must explicitly state that it possesses DNA evidence with which the defendant's sample can be compared. *Id.* Minnesota has no such requirement.

6

N.W.2d 351, 362 (Minn. 2003). McBride argued that the warrants were not supported by adequate probable cause because the affidavits "did not provide any reason to believe such correspondence existed or that it would be relevant to the crime under investigation." *Id.* The supreme court affirmed the district court's rejection of this argument, reasoning that "it was not uncommon for caregivers to exchange information" and that, because the affidavit stated that McBride was a caregiver for the mother's child, "it was reasonable to expect that [the mother] would share information with McBride."

Here, it was reasonable to expect that Sharp's DNA would be found on the gun because the affidavit states that Sharp had been seen holding the gun, and the gun was found inside what the police believed to be his residence a short time later. Although the affidavit could have been worded more precisely, the challenged language reasonably implies that the police intended to test the gun for DNA to compare to the sample sought from Sharp in order to proceed with the ineligible-possession charge. The affidavit provides specific facts establishing a direct connection between Sharp's allegedly criminal possession of a gun and his DNA. *See State v. Fort*, 768 N.W.2d 335, 342 (Minn. 2009) ("We consider whether the information presented in the affidavits provided to support probable cause presents specific facts to establish a direct connection between the alleged criminal activity and the site to be searched." (citation and quotation marks omitted)). As in *McBride*, the fact that it was possible the evidence did not exist does not render the warrant defective. On this record, we conclude that the totality of the circumstances establish a fair probability that Sharp's DNA would be found on the gun.

**II.    Sufficient evidence supports Sharp's terroristic-threats conviction.**

When reviewing the sufficiency of the evidence supporting a jury verdict, we are "limited to ascertaining whether, given the facts in the record and the legitimate inferences that can be drawn from those facts, a jury could reasonably conclude that the defendant was guilty of the offense charged." *Bernhardt v. State*, 684 N.W.2d 465, 476 (Minn. 2004) (quotation omitted). We "will not disturb the verdict if the jury, acting with due regard for the presumption of innocence and for the necessity of overcoming it by proof beyond a reasonable doubt, could reasonably conclude that [the] defendant was proven guilty of the offense charged." *Id.* at 476-77.

Sharp argues that the evidence was insufficient to support the jury's guilty verdict for terroristic threats against L.W. because the jury improperly considered L.W.'s statements to the 911 operator and Officer Spencer as substantive evidence of Sharp's guilt. The district court gave the following impeachment instruction to the jury:

> In deciding the believability and weight to be given the testimony of a witness, you may consider evidence of a statement by or conduct of the witness on some prior occasion that is inconsistent with present testimony. Evidence of any prior inconsistent statement or conduct should be considered only to test the believability and weight of the witness's testimony.

Sharp argues that this instruction precluded the jury from considering L.W.'s prior statements as substantive evidence, leaving no evidence to support the terroristic-threats charge. We disagree.

L.W. and J.H.'s statements to the 911 operator, along with L.W.'s statements to Officer Spencer, were admitted as substantive evidence under the excited-utterance

8

exception to the hearsay rule. Minn. R. Evid. 803(2). The admissibility of the 911 recording was discussed in a pretrial hearing. The state was concerned about the admissibility of J.H.'s statements because he would not be present to testify, and argued that this portion of the tape should be admitted as an excited utterance. The defense attorney stated that "I do agree with counsel that it would likely be an excited utterance. . . . So today I don't have any objection to the tape." As to L.W.'s statements on the 911 call, the defense attorney stated that "on the presumption that she'll be here, I don't have any objection." At trial, the district court overruled defense counsel's objection to Officer Spencer's testimony that L.W. and J.H. "jumped out [of their vehicle and] start[ed] screaming, he's got a gun, he's got a gun." Sharp did not seek an instruction limiting the jury's consideration of these statements to impeachment evidence.

Sharp does not challenge the admissibility of L.W.'s and J.H.'s out-of-court statements, but argues that they cannot support the jury's verdict because, in light of the jury instruction on inconsistent statements, they are not substantive evidence. Sharp cites no legal support for this novel proposition and we have found none. The standard jury instruction does not override the district court's admission of the statements as excited utterances, or preclude the jury's consideration of them in reaching its verdict.

We conclude that the jury verdict was supported by sufficient evidence. Minn. Stat. § 609.713, subd. 1 (2012), makes it a crime to "threaten[], directly or indirectly, to commit any crime of violence with purpose to terrorize another . . . or in a reckless disregard of the risk of causing such terror." L.W. and J.H. both told the 911 operator that Sharp had a gun and was threatening them with it. L.W. told Officer Spencer that

9

Sharp walked toward their vehicle, "pulled the gun out and said that he was going to kill them." Police retrieved a gun from inside L.W.'s house, and testing indicated that Sharp could not be excluded as a contributor to two DNA samples found on the gun but 92.7% and 99.99993% of the general population could be. On this record, Sharp's sufficiency-of-the-evidence challenge fails.

**III.    Sharp was not denied a fair trial when the district court replayed the 911 call during jury deliberations.**

A district court has broad discretion when determining whether to allow jurors to review evidence during deliberations. *State v. Young*, 710 N.W.2d 272, 284 (Minn. 2006). When making this determination, the district court should consider "(i) whether the material will aid the jury in proper consideration of the case; (ii) whether any party will be unduly prejudiced by submission of the material; and (iii) whether the material may be subjected to improper use by the jury." *State v. Kraushaar*, 470 N.W.2d 509, 515 (Minn. 1991).

During its deliberations, the jury asked to hear the 911 recording for a third time. The district court granted the request and the 911 call was replayed in the courtroom with Sharp and counsel present. Sharp argues that the district court abused its discretion in doing so because replaying the 911 call (1) did not significantly aid the jury in determining Sharp's guilt, (2) was unduly prejudicial, and (3) significantly increased the likelihood that it would be used improperly in the determination of guilt. We address each argument in turn.

10

First, Sharp asserts that replaying the call did not significantly aid the jury because they had already heard the recording twice with the assistance of a transcript. The fact that a jury has heard a particular piece of evidence twice before does not, alone, lead to the conclusion that a district court abuses its discretion in allowing the jury to review the evidence a third time. *See State v. Reed*, 737 N.W.2d 572, 586 (Minn. 2007) (concluding that it was not an abuse of discretion for the district court to play a 911 call for the *fourth* time). As noted above, the recording contains statements relevant to the terroristic-threats charge. And given L.W.'s conflicting trial testimony, the recording aided the jury in determining her credibility.

Second, Sharp argues that replaying the call was unduly prejudicial because (1) "it served only to further emphasize one specific piece of evidence that had already been singled out by the prosecution in presenting it during closing argument," and (2) because, by playing the tape in isolation from L.W.'s inconsistent testimony, "the district court implicitly highlighted its importance to the jury and in turn deemphasized any inconsistent statements [L.W.] made in person and under oath at trial." Although the 911 recording was the only evidence that the jury asked to review during deliberations, this alone does not indicate that Sharp was prejudiced by the "undue prominence" given that piece of evidence. *See id.* ("The jury is permitted to choose which evidence it will re-examine."). Sharp presented evidence through L.W.'s trial testimony and written statement that L.W. fabricated her statements to the 911 operator. Sharp's attorney relied heavily on this evidence during closing argument. It is not clear that any undue prejudice resulted in allowing the jury to hear the 911 call a third time.

Finally, Sharp reiterates his argument that L.W.'s statements to the 911 operator were only admissible as impeachment evidence, asserting that replaying the call significantly increased the likelihood that the statement would be used improperly by the jury. We have already rejected Sharp's assertion that the 911 recording is not substantive evidence. In sum, we discern no abuse of discretion or unfairness to Sharp occasioned by the district court's decision to provide the 911 recording to the jury during its deliberations.

## IV. The prosecutor did not commit misconduct during his closing argument.

Because Sharp did not object to the prosecutor's closing argument, we review Sharp's challenge under the modified plain-error standard articulated in *State v. Ramey*, 721 N.W.2d 294 (Minn. 2006). Under this standard, a defendant must "demonstrate both that error occurred and that the error was plain." 721 N.W.2d at 302. An error is plain if it "contravenes case law, a rule, or a standard of conduct," or is otherwise "clear or obvious." *Id.* (quotation omitted). If the defendant makes this showing, the state must demonstrate that the error did not affect the defendant's substantial rights. *Id.* We will reverse a conviction due to prosecutorial misconduct "only if the misconduct, when considered in light of the whole trial, impaired the defendant's right to a fair trial." *State v. Powers*, 654 N.W.2d 667, 678 (Minn. 2003).

The prosecutor asked L.W. a series of questions about whether she is afraid of Sharp, fears the consequences of testifying against him, and changed her testimony because of her fear. Sharp did not object to this line of questioning and L.W. answered no to each question.

12

In his closing, the prosecutor argued, "The evidence in this case paints a pretty clear picture, and that is a picture of a young woman who was very, very scared. She is scared of what would happen to her if she were to tell you what really happened that day." Sharp argues that this statement deprived Sharp of a fair trial because it was contrary to L.W.'s testimony, not supported by evidence in the record, and "inflamed the prejudices of the jury against Sharp by suggesting that he has a violent character." "While the state's argument need not be 'colorless,' it must be based on the evidence produced at trial, or the reasonable inferences from that evidence." *State v. Porter*, 526 N.W.2d 359, 363 (Minn. 1995). And a prosecutor must avoid making statements that would inflame the jury's passions and prejudices. *Id.*

Viewed as a whole, the prosecutor's closing argument was not misconduct and did not impair Sharp's right to a fair trial. Until making the challenged statement, the prosecutor did not mention L.W.'s fear as the reason the jury should not consider her trial testimony credible. The prosecutor reviewed the evidence in the record and, on that factual basis, suggested the inference that L.W.'s fear of Sharp reasonably explains the inconsistency between her earlier statements to police and her trial testimony. *See State v. Pearson*, 775 N.W.2d 155, 163 (Minn. 2009) ("[A prosecutor] may not speculate *without a factual basis*." (emphasis added)). And the challenged statement constituted only one sentence at the end of an otherwise inoffensive closing argument. *See State v. McDaniel*, 777 N.W.2d 739, 751 (Minn. 2010) ("[C]ourts must look at the closing argument as a whole, rather than just selective phrases or remarks that may be taken out

13

of context or given undue prominence to determine whether reversible error has occurred." (citation omitted)). On this record, we discern no prosecutorial error.

**V. The 43-day trial delay did not violate Sharp's right to a speedy trial.**

The United States and Minnesota Constitutions guarantee a criminal defendant the right to a speedy trial. U.S. Const. amend. VI; Minn. Const. art. I, § 6; *see also* Minn. R. Crim. P. 11.09 (trial must commence within 60 days of a demand by any party). We review de novo whether a defendant's right to a speedy trial has been violated. *State v. Johnson*, 811 N.W.2d 136, 144 (Minn. App. 2012), *review denied* (Minn. Mar. 28, 2012).

To determine whether a defendant's speedy-trial right has been violated, we examine the factors set out in *Barker v. Wingo*, 407 U.S. 514, 92 S. Ct. 2182 (1972): "(1) the length of the delay; (2) the reason for the delay; (3) whether the defendant asserted his right to a speedy trial; and (4) whether the delay prejudiced the defendant." *Johnson*, 811 N.W.2d at 144 (quoting *State v. Hahn*, 799 N.W.2d 25, 30 (Minn. App. 2011)). We consider these factors along with other relevant circumstances. *Id.*

At a hearing on January 11, 2013, Sharp moved to exclude the DNA evidence based on late disclosure. In the alternative, Sharp moved to continue the trial for at least 30 days so that his attorney could retain an expert. The district court denied the motion to suppress and continued the trial for 30 days. The trial commenced 43 days beyond the 60-day deadline.

The record shows that two of the *Barker* factors are satisfied. There is no dispute that Sharp adequately asserted his speedy-trial right (third factor), and the trial did not begin within 60 days of Sharp's speedy-trial demand (first factor). *See id.* ("[A] delay of

14

more than 60 days from the date of the speedy-trial demand is presumptively prejudicial, triggering review of the remaining three factors."). But the remaining factors weigh against finding a speedy-trial violation.

There is nothing in the record to indicate that the state's late disclosure of the DNA evidence resulted from a deliberate act. *See Barker*, 407 U.S. at 531, 92 S. Ct. at 2192 ("A deliberate attempt to delay the trial in order to hamper the defense should be weighted heavily against the government. A more neutral reason such as negligence or overcrowded courts should be weighted less heavily . . . ."). And Sharp specifically requested a trial continuance of at least 30 days as an alternative to suppressing the evidence.

Likewise, nothing in the record indicates that the delay prejudiced Sharp. "The Supreme Court has identified three interests that are protected by the right to a speedy trial: (1) preventing oppressive pretrial incarceration; (2) minimizing the anxiety and concern of the accused; and (3) preventing the possibility that the defense will be impaired." *Johnson*, 811 N.W.2d at 145 (quotation omitted). There is no evidence that any of these interests were implicated. On balance, the *Barker* factors do not support Sharp's assertion that he was denied the right to a speedy trial.

**Affirmed.**