# THE STATE OF SOUTH CAROLINA
## In The Supreme Court

The State, Petitioner,

v.

Daniel J. Jenkins, Respondent.

Appellate Case No. 2012-212544

---

## ON WRIT OF CERTIORARI TO THE COURT OF APPEALS

---

Appeal From Charleston County
Deadra L. Jefferson, Circuit Court Judge

---

Opinion No. 27537
Heard March 3, 2015 – Filed July 1, 2015

---

## REVERSED

---

Attorney General Alan McCrory Wilson, Chief Deputy
Attorney General John W. McIntosh, Senior Assistant
Deputy Attorney General Salley W. Elliott, Assistant
Attorney General Mark Reynolds Farthing, all of
Columbia; and Solicitor Scarlett Anne Wilson, of
Charleston, for Petitioner.

Appellate Defender Kathrine Haggard Hudgins, of
Columbia, for Respondent.

---

**CHIEF JUSTICE TOAL:** The State appeals the court of appeals' decision reversing the trial court's finding that a search warrant for samples of Daniel Jenkins's (Respondent) DNA was valid, and remanding for an evidentiary hearing regarding whether the State would have inevitably discovered Respondent's DNA during the course of its investigation.[1] *State v. Jenkins*, 398 S.C. 215, 727 S.E.2d 761 (Ct. App. 2012). We reverse, and reinstate Respondent's conviction for criminal sexual conduct in the first degree (CSC-First).

## FACTS/PROCEDURAL BACKGROUND

In 2006, H.M. (the victim) lived by herself in downtown Charleston, South Carolina. At the time, she worked for a local bakery, to which she commuted by bicycle or bus. During her commute, the victim frequently passed Jabbers, a local grocery store, and casually greeted the people loitering outside, many of whom lived in the area and often gathered there. Although the victim did not know any of these people beyond exchanging a passing greeting, she came to learn that one of the people with whom she exchanged pleasantries was nicknamed "Black."

The victim testified that on April 5, 2006, she arrived home from work, consumed several alcoholic beverages, and fell asleep around 8 p.m. Approximately two hours later, the victim awoke to a knock at her door. She opened the door and saw Black, who asked the victim if she either wanted to go out and share a drink, or if she would lend him money to buy beer that he could then bring back to her apartment. When the victim declined, Black continued to pester her, asking her those same two questions repeatedly.

The victim stated she became uncomfortable, so she took a step back into her apartment to place some distance between herself and Black. However, Black stepped in "aggressively" behind her, and the two sat on the victim's sofa for a brief time while Black smoked a cigarette. Shortly thereafter, Black began making lewd sexual demands and threatening the victim, stating that if she did not comply with his demands, he would kill her.

The victim firmly told Black to leave because her boyfriend was coming over.[2] Thereafter, Black grasped a heavy glass candleholder and repeatedly struck

---

[1] *See Nix v. Williams*, 467 U.S. 431 (1984) (establishing and explaining the inevitable discovery doctrine).

[2] The victim did not have a boyfriend at the time, and was merely trying to induce Black into leaving her apartment.

the victim around the forehead, ears, and mouth.

A struggle ensued, during which Black pushed the victim's cordless telephone out of her reach. Ultimately, Black wrestled the victim's pants off of her, tore off her underwear, and forcibly engaged in sexual intercourse with the victim. Black then threatened to kill the victim if she told anyone about the encounter, and left the victim's apartment.

After the victim could not find her telephone, she ran outside for help. She unsuccessfully knocked on several neighbors' doors and attempted to stop three passing cars before encountering a woman on the street near Jabbers. The woman asked the victim what happened to her, but before the victim could speak, Black approached the women.

The victim stated that she became overwhelmed by Black's presence and started crying and asking to use a telephone. Black grabbed the victim's arm and "half-carried, half-guided" the victim to an alley across the street. He told her that he had her telephone and would return it if she washed the blood off of her face. Black then forcibly held the victim's head under a nearby faucet.

After Black returned the telephone, the victim ran back to her apartment and hid under a tarp on the side of the building while she called the police. She described her assault to the responding officers and told them that her attacker's nickname was Black.

The officers were familiar with a man from the neighborhood whose nickname was Black, but whose true identity was Respondent. They searched for and located Respondent within a matter of minutes in an abandoned building across the street from Jabbers, where he was sleeping nude. Other officers escorted the victim to Jabbers's parking lot, where she positively identified Respondent as her attacker.

After identifying Respondent, the victim underwent a rape examination. The nurse conducting the examination testified that the victim had a blackened eye, a bloody nose, a split lip, bleeding on the inside of her mouth, bruising on her arms and shoulders, abrasions and lacerations on her genitals, and defensive wounds on her hands. Further, the nurse found semen on vaginal and rectal swabs taken from the victim, as well as on various clothing and bodily swabs. The nurse stated that while the wounds and semen could be consistent with consensual sex, they were more likely the result of forcible sex.

In processing the alleged crime scene at the victim's apartment, police officers found blood stains on the victim's sofa, and her ripped underwear and a heavy glass candleholder lying on the floor. A fingerprint examiner testified that two of the three fingerprints recovered from the candleholder were Respondent's.

The following day, a police officer obtained a search warrant for Respondent's DNA to compare to the DNA recovered from the rape examination swabs. The affidavit necessary to establish probable cause for the warrant read:

> On 4/5/06 at approximately 22:30 hours while at [the victim's address], the subject, [Respondent] . . . , did enter the victim's residence and threatened to kill her if she did not comply with his demand to perform oral sex on her. The victim attempted to fight the subject, however he overpowered her by striking her in and about her face using a glass candle holder [sic].
>
> The subject then penetrated the victim's vagina with his tongue and penis. The DNA samples of blood, head hair and public hair will be retrieved from the suspect by [] trained medical personnel in a medical facility. The collection of these samples will be conducted in a noninvasive manner.[3]

A forensic DNA analyst developed a DNA profile from the rape examination swabs, and compared that profile to Respondent's DNA profile. The DNA profiles matched, with a 1 in 8.6 quintillion chance that the semen on the rape examination swabs came from an unrelated person.

Prior to the State introducing it at trial, Respondent moved to suppress the DNA evidence, arguing that the affidavit did not establish probable cause because it omitted: (1) the source of the officer's information regarding the assault, so that the Magistrate could judge the source's credibility; (2) how the officer came to suspect Respondent of the crime; (3) the victim's positive identification of Respondent as her attacker in Jabbers's parking lot; (4) photographs and physical evidence obtained of both the victim and the alleged scene of the crime; and (5) the results of the rape examination that the victim underwent, including the genital abrasions and lacerations, as well as the presence of semen. The trial court denied

---

[3] The officer did not supplement the affidavit with oral testimony in front of the Magistrate who granted the warrant.

the motion to suppress.[4]

Ultimately, the jury convicted Respondent of CSC-First. Because of Respondent's two prior convictions for CSC-First and carjacking, both of which are "most serious offenses" under section 17-25-45(C)(1) of the South Carolina Code, the trial court imposed a mandatory sentence of life in prison without the possibility of parole. *See* S.C. Code Ann. § 17-25-45 (2014).

Respondent appealed, and the court of appeals remanded the case for an additional evidentiary hearing. *Jenkins*, 398 S.C. at 215, 727 S.E.2d at 761. Specifically, the court of appeals found the search warrant to obtain Respondent's DNA was invalid for two reasons. *Id.* at 221–25, 727 S.E.2d at 764–66. First, the court of appeals held that the affidavit in support of the warrant did not establish probable cause because it contained only conclusory statements; failed to set forth the source of the facts contained therein; and lacked any information allowing the Magistrate to make a credibility determination regarding the source of the information. *Id.* at 222–24, 727 S.E.2d at 764–66. Second, the court of appeals found that the affidavit was defective because it did not contain any indication that the police had obtained DNA evidence from the rape examination, and thus it did not establish that Respondent's DNA would have been relevant to the investigation. *Id.* at 224–25, 727 S.E.2d at 766. Moreover, the court of appeals found that admitting the DNA evidence was not harmless error because it bolstered the victim's credibility regarding two critical facts: that Respondent was her attacker, and that the sexual intercourse was not consensual. *Id.* at 225–27, 727 S.E.2d at 766–67.

Despite reversing the trial court's admission of the DNA evidence, the court of appeals did not order a new trial, but instead remanded the case for an evidentiary hearing. *See id.* at 227–30, 727 S.E.2d at 767–69. The court of appeals did so in response to the State's argument that Respondent's DNA would have been inevitably discovered regardless of the defective search warrant. *Id.* Specifically, the State asserted that Respondent's DNA was already on file in the State's DNA Identification Record Database due to his prior conviction for CSC-First. *See id.* at 228, 727 S.E.2d at 768; *see also* S.C. Code Ann. §§ 23-3-610, -620(A), -620(B), -640, -650(A) (2007 & Supp. 2014) (allowing the State to

---

[4] As a result, Respondent's counsel changed strategies mid-trial from attempting to blame the assault on the victim's abusive ex-boyfriend to attempting to characterize the encounter as consensual sexual intercourse between Respondent and the victim.

obtain, store, and use a criminal defendant's DNA sample as a result of prior convictions).  However, because the trial court found the search warrant was not defective, the State contended it never had the opportunity to present this evidence.  *Jenkins*, 398 S.C. at 228, 727 S.E.2d at 768.  The court of appeals therefore remanded Respondent's case to the trial court to determine whether the inevitable discovery doctrine applied in this particular situation.  *Id.* at 230, 727 S.E.2d at 769.

We granted the State's petition for a writ of certiorari to review the court of appeals' decision.

## ISSUE

Whether admission of the DNA evidence obtained as a result of the defective search warrant constituted harmless error?

## STANDARD OF REVIEW

In criminal cases, the appellate court sits to review errors of law only.  *State v. Black*, 400 S.C. 10, 16, 732 S.E.2d 880, 884 (2012).  The court is "bound by the trial court's factual findings unless they are clearly erroneous."  *Id.*

## ANALYSIS

The State has not challenged the court of appeals' finding that the affidavit did not establish probable cause, and that the search warrant to obtain Respondent's DNA was thus invalid.  As such, we need only determine whether the trial court's error in admitting the DNA evidence was harmless beyond a reasonable doubt, and whether remand for an evidentiary hearing was the appropriate remedy.

The United States Supreme Court has distinguished between trial errors and structural defects in the trial mechanism itself.  *State v. Mouzon*, 326 S.C. 199, 204, 485 S.E.2d 918, 921 (1997) (discussing *Arizona v. Fulminante*, 499 U.S. 279 (1991)).  Structural defects "affect the entire conduct of the trial from beginning to end," whereas trial errors "occur during the presentation of the case to the jury, and may therefore be quantitatively assessed in the context of other evidence presented in order to determine whether its admission was harmless beyond a reasonable doubt."  *Id.* (quoting *Fulminante*, 499 U.S. at 307–08, 309) (internal quotation marks omitted).  Differentiating between structural and trial errors serves "to enforce procedural safeguards while ensuring that inconsequential, technical errors do not result in a new trial."  *State v. Chavis*, 412 S.C. 101, 115, 771 S.E.2d 336,

343 (2015) (Hearn, J., dissenting).  Most errors that occur during trial, including those that violate a defendant's constitutional rights, are trial errors that are subject to harmless error analysis.  *State v. Rivera*, 402 S.C. 225, 246, 741 S.E.2d 694, 705 (2013).

Harmless error analyses are fact-intensive inquiries and are not governed by a definite set of rules.  *State v. Byers*, 392 S.C. 438, 447–48, 710 S.E.2d 55, 60 (2011); *State v. Davis*, 371 S.C. 170, 181, 638 S.E.2d 57, 63 (2006).  Rather, appellate courts must determine the materiality and prejudicial character of the error in relation to the entire case.  *Byers*, 392 S.C. at 448, 710 S.E.2d at 60; *see also Black*, 400 S.C. at 27–28, 732 S.E.2d at 890 (stating that with respect to wrongly-admitted evidence impacting a witness's credibility, the Court should consider "the importance of the witness's testimony to the prosecution's case, whether the witness's testimony was cumulative, whether other evidence corroborates or contradicts the witness's testimony, the extent of cross-examination otherwise permitted, and the overall strength of the State's case").  An error is harmless if it did not reasonably affect the result of the trial.  *State v. Bryant*, 369 S.C. 511, 518, 633 S.E.2d 152, 156 (2006); *see also State v. Tapp*, 398 S.C. 376, 389, 728 S.E.2d 468, 475 (2012) ("Engaging in this harmless error analysis, we note that our jurisprudence requires us not to question whether the State proved its case beyond a reasonable doubt, but whether beyond a reasonable doubt the trial error did not contribute to the guilty verdict.").

Here, the court of appeals found that absent the DNA evidence, the case boiled down to a credibility contest between the victim—asserting that she was sexually assaulted by Respondent—and Respondent—alternatively asserting that the perpetrator of the assault was the victim's abusive ex-boyfriend, or that any sexual intercourse between the victim and Respondent was consensual.  We find this conclusion to be incomplete based on our review of the totality of the evidence presented by the State.

Notwithstanding the DNA evidence, there was abundant, independent evidence in the record from which the jury could have found Respondent guilty.  For example, the victim testified at length, giving a detailed account of the assault and the events that followed.  Moreover, the State presented physical evidence regarding the results of the rape examination conducted on the victim, including the extensive nature of the victim's injuries, the defensive wounds on the victim's body, and the presence of semen.  The State likewise presented testimony from the nurse who performed the rape examination that the victim's wounds were consistent with sexual assault.  Other testimony revealed that the responding

officers described the victim as "roughed up pretty good," and the rape examination nurse described the victim's face as "quite bruised." Additionally, the investigation of the alleged crime scene at the victim's apartment uncovered the victim's ripped underwear and blood and fingerprint evidence corroborating the victim's version of events. Finally, the responding police officers independently connected Respondent to the crime by his nickname "Black" due to their previous dealings with him. Further, after the officers searched for Respondent and found him naked and asleep a short distance away from the scene of the crime, the victim positively identified Respondent as her attacker within thirty minutes of the assault.

Accordingly, contrary to the court of appeals' assertion, this case was not dependent on the credibility of the victim and Respondent, with the DNA evidence serving as the only physical evidence that Respondent committed the assault. *Cf. State v. Jennings*, 394 S.C. 473, 480, 716 S.E.2d 91, 94–95 (2011) ("We further find the trial court's admission of the reports did not amount to harmless error. *There was no physical evidence presented in this case. The only evidence presented by the State was the children's accounts of what occurred* and other hearsay evidence of the children's accounts. Because the children's credibility was the most critical determination of the case, we find the admission of the written reports was not harmless." (emphasis added) (citation omitted)). Rather, there was other physical evidence that the victim was sexually assaulted, and that Respondent was the perpetrator.[5]

Further, while we agree that the DNA evidence was compelling, there is no jurisprudence in this State that DNA is either necessary or conclusive to establishing a defendant's guilt beyond a reasonable doubt. Rather, there are countless cases in which the State has not presented DNA evidence—either because it could not or chose not to do so—and a jury nonetheless properly

---

[5] Moreover, the DNA evidence only established that the victim and Respondent engaged in sexual intercourse, which Respondent's counsel conceded to the jury. However, the DNA evidence did *not* establish whether the encounter was consensual or non-consensual, which the rape examination nurse stated under cross-examination by Respondent's counsel. Thus, the DNA evidence did not boost the victim's credibility that the intercourse was forced on her. Rather, the victim's claim that the intercourse was unwanted was supported by, *inter alia*, evidence of the injuries to her face and genitals, including the tears, abrasions, and defensive wounds.

convicts the defendant.  DNA evidence is merely one way to establish that the accused is the perpetrator.  However, the presence or absence of DNA evidence does not taint the remainder of the evidence in the record, nor does it overwhelm the jury's ability to make credibility determinations and decide whether a defendant is guilty.  Like with fingerprinting and blood typing, both of which are similarly compelling types of evidence, DNA evidence can be disputed.

Accordingly, we find the admission of the DNA evidence in this case was harmless error, and we decline to adopt a per se rule that a new trial is mandatory any time DNA evidence is wrongly admitted.[6]

## CONCLUSION

For the foregoing reasons, we reverse the portion the court of appeals' decision remanding the case for an evidentiary hearing regarding the applicability of the inevitable discovery doctrine.  Instead, we reinstate Respondent's conviction for CSC-First because any error made by the trial court was harmless.

**REVERSED.**

**BEATTY, KITTREDGE and HEARN, JJ., concur.  PLEICONES, J., dissenting in a separate opinion.**

---

[6] Because this issue is dispositive, we do not reach the State's second issue regarding whether it would have inevitably discovered Respondent's DNA during the course of its investigation.  *See Wilkinson ex rel. Wilkinson v. Palmetto State Transp. Co.*, 382 S.C. 295, 307, 676 S.E.2d 700, 706 (2009).

**JUSTICE PLEICONES:**  I respectfully dissent from the majority's decision to reverse the court of appeals as in my view, the erroneous admission of the DNA evidence—which the majority finds "compelling"—was not harmless.  I would remand for a new trial.

The majority holds that notwithstanding the DNA evidence, there was abundant, independent evidence in the record from which the jury could have found Respondent guilty.  In addition to the victim's testimony—which in my view is the only evidence *Respondent* sexually assaulted the victim—the majority relies on the results of the rape examination on the victim,[7] the testimony from the nurse who performed the rape examination that the victim's face was "quite bruised," the testimony from the responding officer that described the victim as "roughed up pretty good," and the presence of the victim's ripped underwear and "blood and fingerprint evidence"[8] at the scene.  In my opinion, this evidence merely shows that the victim was likely sexually assaulted and that Respondent has been in the victim's home, not that Respondent was the perpetrator of the sexual assault.  Accordingly, this case is indeed a battle of credibility between the victim and Respondent regarding Respondent's involvement in the sexual assault.  In my view, the majority fails to point to the existence of overwhelming evidence of guilt as the victim's testimony was the only evidence that identified Respondent as the perpetrator of the sexual assault.  *See State v. Chavis*, 412 S.C. 101, 109-10 & n.7, 771 S.E.2d 336, 340 (2015) (stating the materiality and prejudicial character of the error must be determined from its relationship to the entire case and the wrongful admission of evidence can be deemed harmless where there is other overwhelming evidence of guilt).[9]

---

[7] The results of the rape examination were not conclusive that a sexual assault occurred.  In fact, the nurse who performed the rape examination agreed that everything discovered in the pelvic examination could be consistent with consensual intercourse.

[8] Blood was found on the victim's couch and Respondent's fingerprints were recovered from a glass candleholder.

[9] In my view, the majority's reliance in footnote 5 on the concession by Respondent's counsel during argument that Respondent and the victim had consensual sex is improper because the concession was a necessary by-product of the lower court's erroneous decision to admit the DNA evidence.  Respondent should not be bound by this concession because his attorney unsuccessfully sought to ameliorate the prejudice from an erroneous evidentiary ruling.

Since I find the admission of the DNA evidence not harmless, I address the propriety of the court of appeals' decision to remand for an evidentiary hearing. In my view, remand for an evidentiary hearing to determine whether the inevitable discovery doctrine applies is improper. Here, inevitable discovery is advanced as an additional sustaining ground and it is well settled that the evidence forming the basis for an additional sustaining ground must appear in the record on appeal. There is no evidence in the record on appeal that Respondent's DNA is in the State DNA database. *See* Rule 220(c), SCACR; *I'On, L.L.C. v. Town of Mt. Pleasant*, 338 S.C. 406, 420, 526 S.E.2d 716, 723 (2000). I would reverse respondent's conviction and remand for a new trial.

For the reasons given above, I would find the erroneous admission of DNA evidence not harmless, reverse respondent's conviction, and remand to the lower court for a new trial.